UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------------------x

Guy Gentile,

                                    *Plaintiff*,

            -against-

U.S. Securities and Exchange Commission

                                    *Defendant*.
--------------------------------------------------------------------x

Civil Action No.:

**COMPLAINT FOR ABUSE OF
PROCESS AND DECLARATORY
AND INJUNCTIVE RELIEF
DEMAND FOR JURY TRIAL**

Guy Gentile, for his complaint against the U.S. Securities and Exchange Commission

alleges as follows:

## NATURE OF THE ACTION

1.      Guy Gentile brings this action for declaratory and injunctive relief to prevent the

Commission – acting principally through its staff attorneys in the Miami Regional Office of the

SEC – from continuing to abuse its investigatory process and the process of the federal courts by

conducting a six-year sham "investigation" into him and his Bahamian broker-dealer.  This

investigation out of the Miami Regional Office of the SEC has been undertaken without a

Formal Order of Investigation (FOI) authorizing the staff to investigate Mr. Gentile or his broker

dealer making the entire investigation improper and requiring all outstanding subpoenas issued

under it and evidence collected to date to be quashed.

2.      The SEC has been using process to investigate Mr. Gentile under a FOI that is

dated November 5, 2013, entitled "In the matter of Traders Café, LLC" and authorizes an

investigation into individuals related to Traders Café for conduct that predates 2012.  The FOI

makes no reference to Mr. Gentile or anyone or anything related to him.  Mr. Gentile has no

connection to Traders Café or any of its agents or related parties.  The actual investigation into

1

Traders Café that the Commission authorized six years ago appears to have concluded in 2014 when the principals of Traders Café pleaded guilty to selling unregistered securities and entered into settlement agreement with the SEC.

3.      Pursuant to 17 C.F.R § 202.5, for the SEC to engage in a formal investigation, in which process may be used – as it has been here – the Commission must be presented with evidence from its staff that it appears from information obtained that there is a likelihood that a violation of the securities laws has been or is about to be committed, and that the issuance of process is warranted.

4.      Given the facts here, it is evident that either evidence suggesting a likelihood that Mr. Gentile has or was about to commit a securities law violation was never presented to the Commission, or if it was presented, it was rejected as insufficient by the Commission.  This is the only rational explanation for why SEC Miami Regional Office staff attorneys have inexplicably been investigating Mr. Gentile pursuant to a six-year-old FOI having nothing to do with him for at least three years, while studiously avoiding filing any action against him in that time.

5.      This action specifically seeks to quash several subpoenas and any evidence obtained through them that was served on Mr. Gentile, his lawyer, his trustee, his bank, his company's vendors and clients, and other individuals and entities served pursuant to the Traders Café FOI.  This action also seeks a declaration ordering the SEC to cease its unauthorized "investigation," which is clearly an abuse of process.  The actions taken by the SEC staff at the Miami Regional Office are improper and plainly not for any legitimate law enforcement purpose.  Rather, they are demonstrably intended solely for the purpose of harassment and to retaliate against Mr. Gentile for stopping his full-time cooperation with the SEC in 2015 and previously defeating both a Department of Justice Indictment and the SEC in civil litigation last year, which

resulted in curtailing the SEC's ability to file untimely complaints.  The SEC appears to also be retaliating against Mr. Gentile for his critical public statements about the agency and for whistleblowing against an SEC employee.

6.      Notably, despite having informed Mr. Gentile three years ago, in March 2016, that its purported investigation into his activities pursuant to the Traders Café FOI was nearly over, the SEC has not filed any legal action against him related to that matter.  Indeed, Mr. Gentile has asserted to the SEC on multiple occasions that, if the Commission has any evidence that he has violated any securities laws in connection with its Traders Café investigation, it should file a complaint against him.  But the SEC has not filed any action in its Trader's Cafe investigating because the purpose of this investigation is apparently to harass, rather than to fulfill, the SEC's congressional mandate.  Instead, the SEC has continued to subpoena Mr. Gentile and those around him for the last three years under ever shifting changes in theories and inquiries that they are pursuing to hassle him. None of the SEC's inquiries are remotely related to Traders Café.

7.      As widely known and reported in the press, Mr. Gentile cooperated with the Department of Justice and the Securities and Exchange Commission for three years between 2012 and 2015.  Following three years of near full-time cooperation, an indictment was filed in the United States District Court for the District of New Jersey (*United States v. Gentile*, Crim. No. 16-155 (JLL), (D.N.J. 2016) and a parallel SEC civil complaint was filed against him alleging wrongful conduct that stopped in 2008, involving trading in stock using the ticker "KYUS."  Both of these actions were ultimately dismissed as untimely.

8.      The SEC represented to United States District Judge Jose L. Linares that the civil case filed in the KYUS matter was both "related" to indictment and "related" to the Traders Café investigation.  But throughout the KYUS litigation in the District of New Jersey and in its

subsequent appeal in the Third Circuit, the Commission has consistently made clear in its filings and representations before both of those Courts that it did not have any information or evidence to suggest that Mr. Gentile ever violated the securities laws after June 2008.

9.      The record here is clear; the staff attorneys operating out of the Miami Regional Office have not obtained appropriate authorization from the Commission to investigate Mr. Gentile, there is no legitimate basis on which to investigate him, no likelihood of obtaining a favorable result in litigation, and the SEC is simply harassing Mr. Gentile and those connected to him.  If the SEC had any evidence and actually intended to protect investors or otherwise fulfill any of its other statutory obligations, it would have taken action against Mr. Gentile years ago, when the Miami Regional office attorneys first asserted in March 2016 that they believed the Trader's Café investigation uncovered that he had been violating the securities laws. The reason the SEC has not brought such allegations in any court action is because it does not have any evidence of Mr. Gentile violating the securities laws despite the fact that he was under constant government supervision while he was cooperating with the Department of Justice and the SEC in the period between July 2012 and his indictment in March 2016 and while he was under separate SEC investigation from at least August 2015 to the present.

10.     The Commission's conduct has continued to violate Mr. Gentile's statutory rights over the past three-and-a-half years has had the effect of damaging Mr. Gentile's ability to earn a living.  Several banks and vendors have stopped doing business with Mr. Gentile as a result of receiving these subpoenas.  Also for the past three-and-a-half years, staff attorneys for the SEC's Miami Regional Office have periodically informed Mr. Gentile that they believe that he is violating the securities laws and intend to bring a case against him, without specifying what they believe he is doing wrong, and for the obvious purpose of forcing him to live with the threat and fear that a lawsuit will be filed against him at any moment.

11.     Mr. Gentile is familiar with this form of government abuse of process and the practice of these follow-on harassment procedures because, of his time cooperating with the government.

12.     It is now beyond dispute that the Commission is acting *ultra vires* and Mr. Gentile seeks court intervention to protect his rights.

13.     It is time for this endless unauthorized "investigation" to cease.

## PARTIES

14.      Plaintiff Guy Gentile was a government cooperator from July 2012 to the end of 2015, and is an entrepreneur and owner of a Bahamian broker-dealer.  At all relevant times he was a citizen of the United States.  Mr. Gentile is domiciled in San Juan, Puerto Rico.

15.     Defendant the U.S. Securities and Exchange Commission is a United States Government agency that is tasked with enforcing the federal securities laws, proposing securities rules, and regulating the securities industry, the nation's stock and options exchanges, and other activities and organizations, including the electronic securities markets in the United States.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  This case calls on the court to determine whether the SEC may continue to abuse process under of the Securities Exchange Act, 15 U.S.C. § 78u.

17.     Under 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events giving rise to the claim occurred here, and the Securities and Exchange Commission is subject to personal jurisdiction in this district. Specifically, the Commission has asserted to The Honorable Jose L. Linares that its investigation into Mr. Gentile under the

Traders Café FOI is related to the civil complaint the Commission filed against Mr. Gentile in this court in March 2016.

## BACKGROUND

18.     Mr. Gentile was alleged by the government to have played a role in two alleged "pump and dump" schemes during 2007-2008 for which he was arrested in July 2012.

19.     Immediately upon his arrest in 2012, Mr. Gentile agreed to cooperate with the DOJ and SEC pursuant to an oral cooperation agreement.  Mr. Gentile was a government cooperator with the FBI, the United States Attorney's Office for the District of New Jersey, and the SEC, with his contacts working out of the SEC's Northeast Regional Office starting in July 2012.

20.     The terms of this cooperation were documented through multiple conversations and memorialized, in part, through email correspondence between the SEC and Mr. Gentile's counsel.

21.     The terms of the agreement provided that Mr. Gentile was to supply the Government with extraordinary cooperation, including: (1) cooperating against his alleged co-conspirators in two charged "pump and dump" schemes; (2) assisting the Government in its investigation of high-value targets unknown to Mr. Gentile, who, though having been on the radar of prosecutors and Federal regulators for years, were previously beyond the Government's reach; (3) leading the Government to individuals and broker-dealers unknown to the Government, whom Mr. Gentile learned were involved in illegal penny stock schemes (unaffiliated with Mr. Gentile); (4) training FBI agents to communicate effectively with targets involved in pump-and-dump schemes; and (5) giving instructional courses to FBI agents and U.S. Attorney's Offices regarding certain securities frauds which are extremely difficult to detect

because of their high-degree of sophistication.  In exchange, the SEC agreed that it would take

Mr. Gentile's cooperation into account when fashioning a potential settlement of any allegations.

22.     Since 2008 and during his cooperation between 2012 and 2015, Mr. Gentile built

two broker-dealers on the core values of providing good services at better prices than his

competitors.  In addition to his successful business ventures, Mr. Gentile, during this time, lived

a law-abiding life, as a model citizen, devoting his time, energy, and resources to his family and

community.  Indeed, Mr. Gentile actively engaged in local politics and charities, obtained a

college degree (in criminal justice), and became a well-respected figure in Putnam County, New

York where he lived for twenty years, before moving to Puerto Rico.  Mr. Gentile's civic work

focused around acting as a political advisor and strategist to the Putnam County Sheriff, and

obtaining his New York firefighter and fire police certificate, and working as a volunteer

firefighter in Putnam.

23.     Over the course of his three years of cooperation, Mr. Gentile provided what the

government consistently and, to this day, still describes as extraordinary cooperation, the likes of

which no one in the U.S. Attorney's Office for the District of New Jersey has previously

encountered.  Mr. Gentile worked for the government on an almost full-time basis during the

first six months of his cooperation and his output rarely fell below the full-time level, requiring

him to be available 24/7 or upon a phone call.

24.     The Government has always acknowledged that it was not just Mr. Gentile's

provision of time that made his cooperation so valuable.  Mr. Gentile was valuable because he

assumed a leadership role in many of the planning sessions and meetings, so as to provide

critical strategy, industry knowledge, and operational know-how that neither agents from the FBI

nor other governmental agencies possessed.

25.     All told, Mr. Gentile's assistance directly led to dozens of individuals being charged not only by the DOJ, but by the SEC as well.  His cooperation gave the SEC in excess of tens of millions of dollars in penalties and disgorgement.

**THE SEC HAS USED A FOI UNRELATED TO MR. GENTILE TO HARASS HIM BY SERVING SUBPOENAS THAT HAVE NO LEGITIMATE LAW ENFORCEMENT PURPOSE**

26.     Despite the fact that the SEC benefitted from its ongoing use of Mr. Gentile's continuing cooperation, around the time Mr. Gentile refused to sign additional tolling agreements in 2014, the SEC surreptitiously started another "investigation" into Mr. Gentile out of the Miami Regional Office by leading him to believe that he was cooperating with the SEC against others, when really the SEC was investigating him.

27.     Mr. Gentile learned about an investigation by the SEC's Miami Regional Office around August 2015 during which time he was led to believe that the investigation involved an inquiry into "Traders Café" and individuals related to that company.  Mr. Gentile believed that it was simply another investigation in which the SEC was seeking his cooperation pursuant to his oral cooperation agreement that had been ongoing for three years, because he had no relationship to Traders Café, other than the company having an account at his broker dealer.

28.     Mr. Gentile volunteered to assist in this inquiry, believing that he was required to do so under the terms of his cooperation agreement with the SEC.  In August 2015, he specifically informed an SEC staff attorney from the SEC's Northeast Regional Office that he was happy to assist and answer any questions the SEC had regarding the Traders Café investigation.  He also stated that he would provide any documents helpful to the investigation.

29.     Mr. Gentile received a copy of the Traders Café FOI.  The FOI, dated November 5, 2013, was signed by the Commission authorizing the SEC to investigate matters relating to Traders Café, for conduct allegedly occurring until "at least late 2012."  The FOI is clear that the

Commission authorized it to conduct an inquiry into "Traders Café" which the Commission described as being a Florida Limited Liability Corporation from Tampa, Florida. Traders Café is not registered with the Commission and has not registered its securities in any capacity. The FOI notes that the inquiry was investigating whether there were any violations of Section 5(a) and 5(c) of the Securities Act of 1933 by Traders Café, its officers, directors, employees, partners, subsidiaries, and or affiliates, and other persons or entities, directly or indirectly, may have been or may be offering to sell, selling, and delivering after sale to the public . . . certain securities . . . for which no exemption was or is available.

30.     Guy Gentile is not and has never been remotely related to these categories of individuals who were named in the Traders Café FOI and who the SEC was authorized to investigate.

31.     While unknown to Mr. Gentile at the time, the prior year, on June 10, 2014, Matthew P. Ionno pleaded guilty to a criminal count and entered into a formal offer of settlement with the SEC for conduct relating to his involvement in Traders Café.

32.     Also unknown to Mr. Gentile, on November 18, 2014, Albert J. Scipione pleaded guilty to one count of conspiracy to commit fraud in connection with him being a managing member and manager of Traders Café, LLC. Scipione entered into a formal offer of settlement with the SEC.

33.     Mr. Gentile has no connection to Traders Café, Ionno, or Scipione. The FOI is not a valid document to support any investigation into Mr. Gentile. The people under investigation for the acts that were within the FOI's ambit have already been charged by the SEC, and the claims against others are all barred by the five-year statute of limitations that the SEC is bound by on all enforcement actions seeking any penalty. It would appear that the

Commission completed its investigation into the individuals that the Commission authorized in the FOI.

34.     On August 24, 2015, the SEC served a subpoena on Swiss America Securities, c/o Mr. Gentile seeking documents in connection with its investigation into Traders Café.

35.      Mr. Gentile was actively cooperating with the Commission with his point of contact in the Northeast Regional Office.  Mr. Gentile therefore immediately notified his point person in the New York SEC office that he received the communication and was willing to sit and answer any questions the SEC may have on this matter.  Mr. Gentile requested that all communications for his cooperation be routed through the New York SEC office and to his counsel because the SEC knew that Mr. Gentile was represented and had followed that practice for the prior three years.

36.     Then, in March 2016, the SEC staff informed Mr. Gentile (through counsel) that the investigation out of the SEC Miami Regional Office involving "Traders Café" was not an investigation for which the Commission was seeking Mr. Gentile's assistance as a cooperator. Instead, the SEC was investigating Mr. Gentile himself.  Mr. Gentile was also first told at this time that the SEC Miami Regional Office was contemplating filing a civil complaint against Mr. Gentile for violating securities laws on a theory that "the foreign broker dealer exemption has been blown" based on allegations that his broker dealer was soliciting United States customers.

37.     In March 2016, the SEC staff, asserted that the SEC was in possession of "new evidence" which they claimed supported a finding of a violation of the anti-solicitation regulations by Mr. Gentile's Bahamian broker-dealer, SureTrader.  The SEC staff represented, at that time, that the SEC staff only needed to ask Mr. Gentile a few final questions to close out the inquiry.

38.     Mr. Gentile's Bahamian broker-dealer does not solicit United States customers. All of its advertisements on the internet explicitly state that the advertisement is not intended for US persons, and the broker-dealer's website contains a pop-up blocker which blocks anyone with a US Internet IP Address and requires anyone who wishes to enter the site to confirm that they are not a United States citizen and have not been solicited.

39.     The SEC staff was told that FINRA had previously initiated an investigation into whether the Bahamian broker-dealer was soliciting US clients the prior year, and had concluded its investigation by determining that the broker-dealer was in compliance with all regulations regarding the registration of broker-dealers and anti-solicitation laws based on the company's demonstrated policies and practices.  The SEC staff was also told that Mr. Gentile was a government cooperator for the prior three years, that the FBI and SEC knew everything about his business and its practices, that the FBI was in the office of the Bahamian broker-dealer on numerous occasions, and had informed Mr. Mr. Gentile that he should continue to operate his business as he had been.

40.     As noted above, in March 2016, Mr. Gentile was indicted for conduct alleged to have occurred in 2007–2008 that had formed the predicate of his cooperation in the District of New Jersey.  *See United States v. Gentile*, Crim. No. 16-155 (JLL) (D.N.J. 2016).  The parallel SEC civil action was filed by the Northeast Regional Office contemporaneously with the criminal indictment in the District of New Jersey.  *See SEC v. Gentile*, No. 2:16-cv-01619-JLL-JAD (D.N.J. 2016).

41.     During the pendency of the criminal case, the court stayed the SEC's related civil action against Mr. Gentile and therefore stayed all discovery occurring in that matter.

42.     On March 30, 2016, the SEC Miami Regional Office served on Mr. Gentile a subpoena re: In the Matter of Traders Café (FL-3848) seeking testimony.

43.     On June 6, 2016, the SEC Miami Regional Office inquired when Mr. Gentile would appear for testimony pursuant to the subpoena.

44.     Mr. Gentile informed the Miami Regional Office of the SEC that he would decline to answer questions during his testimony, given the criminal indictment, but would consider answering certain written questions.

45.     On July 6, 2016, the SEC staff sent an email to Mr. Gentile's counsel asking Mr. Gentile to answer dozens of questions, none of which were related to Traders Café or otherwise tied in any way to the FOI.

46.     On July 14, 2016, a SEC staff attorney informed Mr. Gentile that if he did not appear for his scheduled testimony the SEC would "be forced to seek judicial enforcement of the subpoena."  Mr. Gentile informed the SEC that he would not answer any questions absent a court order compelling him to appear and that he intended to fight any court action compelling him to appear because the FOI was unrelated to the investigation into Mr. Gentile.

47.     The SEC declined to file a subpoena enforcement action to compel his testimony.

48.     On September 25, 2017, the SEC staff informed Mr. Gentile that they were proceeding in their investigation into his conduct without his testimony.

49.     The SEC Miami Regional Office agreed to meet with counsel for Mr. Gentile on October 23, 2017 for a meeting.  Prior to the meeting, the SEC informed Mr. Gentile that the focus of their investigation had shifted, and that the office now agreed it would not look into any conduct during the course of his cooperation, or during the course of any part of the FINRA investigation, when the SEC Northeast Regional Office was fully aware of and approved of the manner in which he ran his Bahamian broker-dealer.

50.     In advance of the in-person meeting, on September 25, 2017, the SEC staff confirmed that the SEC Regional Miami Office had made a determination that Mr. Gentile was

violating the securities laws and a civil complaint would be filed.  When asked to inform Mr. Gentile how exactly he was violating the securities laws, the SEC staff said, after speaking to his "higher ups," that he would refuse to disclose that information. The SEC staff stated in sum and substance that there would be "no pre-Wells discussion of what evidence the office has" and that the office "is ready to move to the next stage" meaning recommending to the Commission that a complaint be filed against Mr. Gentile.

51.     On October 23, 2017, counsel for Mr. Gentile had a meeting with the SEC staff attorneys in Miami which was described beforehand as a "pre-wells discussion" to discuss the investigation.  The SEC again asserted that they believed Mr. Gentile was violating the securities laws and intended to file a complaint against him, but wanted to speak with him before doing so.

52.     Counsel for Mr. Gentile again informed the SEC that Mr. Gentile would not speak with them because the office had already determined that it would recommend to the Commission that the SEC file a civil complaint against him.  Mr. Gentile's counsel advised the SEC that, if they wanted to talk to him, they should file a motion to compel his testimony.

53.     Mr. Gentile specifically asked the SEC to file an enforcement action to compel his testimony so that he could challenge in court the subpoena and the investigation being pursued under a FOI that was not related to him.  However, no action was ever filed.

54.     On November 6, 2017, the SEC subpoenaed Mr. Gentile's attorney, Carla Marin. Ms. Marin informed the SEC Miami Regional Office that she would not testify absent a court order compelling her to testify, and that she intended to fight any enforcement action filed that sought to compel her testimony.  On December 6, 2017, the SEC served Ms. Marin with another subpoena seeking documents.  Ms. Marin informed the SEC that she would not comply with the subpoena and intended to fight any motion to compel.

55.     The SEC declined to file any enforcement action seeking to judicially compel Ms. Marin's testimony or the production of documents.

56.     On December 22, 2017, the SEC personally served Mr. Gentile again with a subpoena "In the Matter of Traders Café".

57.     During or prior to September 2017, Citibank and Key Bank, institutions where Mr. Gentile routinely conducted banking for his broker-dealer business, also received subpoenas "In the Matter of Traders Café."   As a result of receiving the SEC subpoenas, both banks decided to close all bank accounts related to Mr. Gentile.  The fact that those accounts were closed seriously compromised Mr. Gentile's ability to run his broker-dealer establishments.

58.     On January 30, 2017, the New Jersey District Court dismissed the criminal matter, finding the entire case time-barred under the statute of limitations.

59.     Following the termination of this parallel criminal action in Mr. Gentile's favor, the court issued an order directing that the SEC's case in New Jersey "shall remain stayed pending" a scheduled court conference.  On April 12, 2017, following the conference, the court issued another order, again maintaining the stay "pending further Order of the Court," and in consideration of the filing of a notice of appeal, which the Government declined to take.  Then, after another round of letters, the court "continue[d] the stay in this matter" until the Supreme Court issued its opinion in *Kokesh*.

**THE COMMISSION CONTINUES TO SERVE SUPBOENAS UNDER THE MIAMI REGIONAL OFFICE'S TRADERS CAFÉ FOI AIMED AT ASSISTING THE SEC'S RELATED LITIGATION IN NEW JERSEY**

60.     Following the dismissal of the criminal indictment in New Jersey, and while the case that the Northeast Regional Office filed against Mr. Gentile was still stayed, the Commission continued to engage in a pretextual investigation from its Miami Regional Office, issuing subpoenas to Mr. Gentile and others related to him.  The Commission intended to use the

information that it collected from the Miami investigation in the civil case in New Jersey, which constituted an improper attempt to circumvent the discovery stay in the New Jersey civil case.

61.     While the subpoenas were issued under the color of an investigation from the Miami Regional Office, they were intended to also be used for the improper collateral objective of overcoming the statute of limitations that created a bar to the SEC's civil action.  The SEC Miami Regional Office was trying to uncover additional evidence of wrongdoing to be used in support of obtaining an injunction and an industry bar in the New Jersey civil case that the commission had filed but was stayed.

**THE COMMISSION VIOLATED THE NEW JERSEY FEDERAL DISTRICT COURT'S STAY ORDER BY SERVING SUBPOENAS INTENDED TO OBTAIN EVIDENCE IN A CASE THAT WAS STAYED**

62.     The Commission improperly obtained evidence through subpoenas issued by the SEC Miami Regional Office pursuant to the Traders Café FOI for use in the New Jersey civil litigation while discovery was stayed in that case.

63.     In a SEC letter to the court dated April 26, 2017, the SEC argued that the stay should be lifted because it intended to seek a remedial injunction against Mr. Gentile, disclosing the existence of a "non-public" investigation "arising out of Mr. Gentile's operation of his Bahamian broker dealer."  The SEC argued that the SEC investigation out of the Miami Regional Office, a clear reference to the Traders Café investigation, was "related" to the conduct alleged in the SEC complaint then pending before Judge Linares in New Jersey District Court.

64.     Notwithstanding the stay order, on April 12, 2017, the Court issued an order, including instructions that the parties exchange Rule 26 initial disclosures during the pendency of the stay.  In its disclosures, the SEC refused to provide information with respect to "related investigations," asserting: "[t]his [Rule 26] disclosure does not include certain related investigations that are still not public or do not concern the factual allegations of the Complaint."

65.     That is, despite the SEC's refusal to provide Mr. Gentile materials from this "related" investigation, the SEC nevertheless indicated to this Court that it would seek to rely on such discovery in support of a supposedly-remedial injunction against Mr. Gentile in the New Jersey civil action.

**THE COMMISSION PURPOSELY TOOK ACTIONS THAT UNNECESSARILY HARMED MR. GENTILE'S REPUTATION**

66.     On May 9, 2017, the SEC confirmed publicly that there was a "non-public" investigation of Mr. Gentile in the SEC's Miami Regional Office that involved his Bahamian broker dealer.  While this investigation was purportedly "non-public" the SEC made no attempt to file this part of their letter under seal, and thereby publicized this investigation of Mr. Gentile and his Bahamian broker dealer in the Miami Regional Office for the purpose, or at least with the effect, of damaging Mr. Gentile's reputation.

67.     This public filing of a "non-public" investigation into Mr. Gentile was not the only action taken by the Commission that appeared to be taken specifically for the purpose of gratuitously damaging his reputation.  By way of limited example, the SEC appears to have erroneously published that an injunction against him was entered when the SEC had merely requested one as a claim for relief.  This resulted in an MIS report indicating that he had been enjoined from violating any securities laws, a false statement that severely harmed his career. The SEC also sent a letter to the Puerto Rico Banking Commission asserting that it believed Mr. Gentile was the type of person who was likely to violate the securities laws, which resulted in his being denied a banking license.

68.     Mr. Gentile filed a letter with the District Court on May 25, 2017, arguing that the SEC should not be allowed to serve investigative subpoenas for a "related" case in Miami during the time period that the related case in New Jersey was pending, particularly since the SEC had indicated that it intended to ultimately use those materials in the action in New Jersey.

69.     In response, the SEC filed another letter with the court arguing that the Commission's investigation into Mr. Gentile out of the Miami Regional Office may be relevant to the "issues of relief in this case" "including the propensity for future misconduct given that Mr. Gentile's conduct is the focus of this litigation and a focus of the separate ["related"] investigation."

70.     Indeed, the SEC's issuance of the subpoenas in the Miami investigation was exploited for the collateral objective of collecting evidence of any violation of the securities laws and to avoid the applicable statute of limitations, and impose an injunction to obtain an industry bar against Mr. Gentile in the New Jersey litigation.

71.     While the SEC could have lawfully pursued an *unrelated* investigation during the pendency of the stay, gathering evidence in a "related" investigation constitutes an abuse of process, as recognized by the SEC's own Enforcement Manual.

72.     Indeed, the SEC's Enforcement Manual indicates that the Staff "may continue to investigate and issue investigative subpoenas . . . while simultaneously litigating a related civil action," but specifically cautions that the SEC's "staff should revisit the issue whenever contemplating the service of investigative subpoenas that could be seen as relating to pending litigation."

73.     Notwithstanding this official policy, the SEC indisputably used these subpoenas in a related investigation for improper collateral objectives of seeking evidence against Mr. Gentile for the intended use against him in the litigation in the New Jersey District Court.

74.     Mr. Gentile filed a motion to dismiss the SEC's New Jersey complaint alleging that the claims were all barred by the applicable statute of limitations.

75.     After submission of the parties' briefs seeking to have the SEC's complaint dismissed for being filed beyond the statute of limitations, the District Court of New Jersey

issued an order on September 18, 2017 requiring the following steps: (1) the SEC was required to file an Amended Complaint that clearly and succinctly stated why the Commission believed that Mr. Gentile's conduct subjecting him to an injunction was not barred by the statute of limitations, and (2) the SEC was instructed to make any allegation of wrongdoing against Mr. Gentile that it could.  The Court ordered the SEC to include in its Amended Complaint any new information because the Commission included an assertion in its brief that the SEC believed it had examples "concerning certain conduct that Mr. Gentile has engaged in after January 2017 that are not asserted in the complaint and would provide a basis for the SEC to obtain an injunction against future violations of the securities laws."

76.     By this date, the Commission had an active investigation into Mr. Gentile for at least 18 months, (on top of the three years of his active cooperation with the SEC) and the lead SEC attorney on the case had already indicated to Mr. Gentile that he believed he was violating the securities laws and was prepared to file a complaint the prior year.

77.     On July 21, 2017, the SEC Miami Regional Office served a subpoena seeking assistance from the Securities Commission of the Bahamas for documents possessed by Mr. Gentile's Bahamian broker-dealer, SureTrader, for the SEC investigation into Traders Café. SureTrader cooperated with the request from the Securities Commission of the Bahamas.

78.     On September 18, 2017, the SEC Miami Regional Office sent a subpoena via email to Mr. Gentile's personal attorney, Carla Marin, again seeking her testimony.  In the cover email, however, the SEC staff attorney made clear that he had no questions regarding Traders Café, but rather stated "[w]e were given your name as someone who might have information pertaining to Swiss America Securities Limited, an entity registered in the Bahamas and doing business as SureTrader.com.  If you have no knowledge or information related to Swiss America, SureTrader.com, or is operations, we can accept an affidavit such in lieu of your testimony."

79.     On September 27, 2017, the SEC subpoenaed a broker-dealer named Stock USA, which Mr. Gentile founded. Stock USA complied with the subpoena.

80.     On September 27, 2017, the SEC also filed with the Securities Commission of the Bahamas a request for assistance in the Matter of Traders Café, seeking certain records from SureTrader that had nothing to do with Traders Café.  SureTrader complied with this request.

81.     By September 2017, the government had indicated to Judge Linares that, in addition to Mr. Gentile being a cooperator with the agency, for over three years, that he had actually met with agents scores of times and answered every single question the agency could come up with, on any topic, truthfully and completely.  Also, by this time, the SEC had opened up a separate investigation into Mr. Gentile out of its Miami Regional Office, which Mr. Gentile had been a target of for at least two years.

82.     Notwithstanding these facts, as of October 6, 2017, when the SEC filed its Amended Complaint against Mr. Gentile, neither the SEC New York or Miami Regional offices were in possession of any evidence suggesting Mr. Gentile engaged in any wrongdoing, and certainly not in possession of evidence that he violated any securities laws, because the Amended Complaint that the SEC filed – with the specific instruction to include all allegations of recent wrongdoing by Mr. Gentile that the SEC could allege in good faith – contained not a single allegation of wrongdoing other than the allegations from 2008.

83.     Finding that the SEC was in possession of no evidence of conduct within the statute of limitations, and that the Commission could make no allegations against Mr. Gentile suggesting he engaged in a violation of the securities laws within the past five years, the District Court dismissed the Amended Complaint against Mr. Gentile on December 13, 2017.

84.     The SEC continued to argue in briefs before the District Court and the Third Circuit Court of Appeals *as late as December 2018* that Mr. Gentile should be subject to an

injunction and industry bar for conduct he allegedly engaged in from 2007 through 2008, but the agency has at no time asserted that its now seven-year-old investigation into Mr. Gentile out of Miami yielded any evidence that he engaged in any knowing violation of the securities laws since that time.

85.     The subpoenas sent to individuals and banks associated with Mr. Gentile have caused significant harm to him and his companies.  By way of limited example, after the SEC served a subpoena on Checkbook.com (a company that handles SureTrader's ACHs) in May 2017, Checkbook.com notified SureTrader that they will no longer be able to process payment transactions and that the decision was made due to "compliance" and "risk."  Similarly, Citibank and Key Bank dropped Mr. Gentile as a client as a result of the subpoenas that the SEC sent to them during or prior to September 2017.

**THE MIAMI REGIONAL OFFICE OF THE SEC HAS CONTINUED TO HARASS MR. GENTILE AFTER THE CIVIL CASE THAT WAS BROUGHT AGAINST HIM WAS DISMISSED AND DURING THE PENDENCY OF ITS APPEAL BEFORE THE THIRD CIRCUIT**

86.     In January 2018, Mr. Gentile informed the SEC Miami Regional Office that he would not testify and would not produce documents absent a court order compelling him to do so, and that he intended to fight any such action.

87.     The SEC Miami Regional Office declined to file any action to compel his testimony.

88.     Eight months later, in August 2018, a new staff attorney from the SEC Miami Regional Office, reached out to Counsel for Mr. Gentile to inform him that the prior staff attorney who had previously said on multiple occasions that he had determined that Mr. Gentile was violating the securities laws had left the office, that a new staff attorney had taken over the file with no preconceived notions about the case, and that everyone in the office who had previously pre-judged the case was no longer involved in the investigation.  As such, the SEC

staff requested that Mr. Gentile comply with the subpoenas served on him the prior year, since this was essentially a new investigation. The focus of the "new inquiry" whether SureTrader advertisements outside the United States that explicitly say "Not intended for U.S. customers" should be considered soliciting U.S. customers because the customers can find the advertisements on the internet if they voluntarily search for them. The SEC acknowledged that even if found, SureTrader's website blocks access from all U.S. IP addresses.

89.     Mr. Gentile informed the SEC staff that he would not voluntarily respond to the subpoena, and that the office would need to file an action seeking judicial intervention.  The SEC staff indicated that they were prepared to file the motion to compel in September 2018.

90.     The SEC did not file a motion to compel Mr. Gentile's testimony at the time.

91.     Thereafter, the SEC served Mr. Gentile's counsel, Ms. Marin, with another subpoena.  Counsel for Ms. Marin informed the SEC that she would not respond absent a court order.

92.     The SEC did not file a motion to compel Ms. Marin's testimony at the time.

93.     This intentional refusal of the SEC Miami Regional Office to file any action against Mr. Gentile in District Court to compel any subpoena in this investigation is because the Commission knows that it cannot win judicial enforcement of an administrative subpoena, as it cannot show either (1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commissioner's possession, and (4) that the administrative steps required . . . have been followed . . . . *United States v. Powell*, 379 U.S. 48, 57 (1964).

94.     On or around February 6, 2019, the SEC filed an action in the United States District Court for the Southern District of Florida seeking to compel the production of documents and taking testimony from Ms. Marin and Mintrade Technologies, LLC, thus triggering this

court's jurisdiction to decide Mr. Gentile's abuse of process claim. Accordingly, Mr. Gentile has been forced to bring this lawsuit to seek redress for these grievances.

## CAUSES OF ACTION

### As for the First Cause of Action
(Abuse of Process)

95.     Mr. Gentile repeats and realleges the facts and allegations set forth in the preceding paragraphs as though set forth fully herein.

96.     The SEC's egregious conduct precludes judicial deference to the SEC's administrative investigatory process.  The subpoenas were issued in bad faith, without legitimate law enforcement basis, without basis in a FOI, and with the intent to do harm to Mr. Gentile without excuse or justification.  The subpoenas are deceitful and serve no purpose other than to continually harass Mr. Gentile.

97.     While Mr. Gentile has refused to respond to the subpoenas served on him, his banking and other business partners have responded and, as a result of the inconvenience that response caused them, have consequently shut him out of their normal commercial dealings.

98.     The Commission does not have any reasonable expectation of obtaining a valid conviction against Mr. Gentile for his involvement in or connection to Traders Café (nor is there any evidence that Mr. Gentile or his Bahamian broker-dealer solicits United States customers).  Indeed, the reasons for the SEC's investigation into Mr. Gentile, do not fall within the ambit of the SEC's FOI in Traders Café.  Mr. Gentile is entitled to "a decision by the SEC itself… that a 'likelihood' of a violation exists and that a private investigation should be ordered.  The SEC order must be supported by an independent agency determination…" *Sec. & Exch. Comm'n v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 130 (3d Cir. 1981).  The Commission has not been presented with information that Mr. Gentile is likely to have engaged in a violation, and no FOI relating to him has been authorized by the Commission.

99.    In short, "the SEC knew that its process was being abused, that it knowingly did nothing to prevent this abuse, and, in addition, that it vigorously pursued the frivolous charges [which] is, like a determination of bad faith, a separate reason for an ultimate conclusion that the court's process was being abused." *Sec. & Exch. Comm'n v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981).

100.    As a result of this abuse of process, Mr. Gentile's statutory rights have been violated and he has incurred substantial legal fees and costs, and suffered injury to his reputation and loss of important business opportunities.

101.    By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Mr. Gentile and the Commission concerning (a) the authority of the Commission to investigate individuals under a FOI which has no nexus to them, and (b) the authority of the Commission to investigate an individual for more than five years after a FOI has issued for purposes that are plainly punitive and retributive for defeating the agency in a prior litigation.

**JURY TRIAL DEMANDED**

Mr. Gentile hereby demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Gentile demands judgment as follows:

A.      For an Order quashing all subpoenas served pursuant to the Traders Café FOI.

B.      For an Order declaring further investigation into Mr. Gentile pursuant to the November 5, 2013 Traders Café FOI authorizing the investigation of conduct unrelated to Mr. Gentile and beyond the statute of limitations as without statutory authority and an abuse of process.

C.      For an Order precluding the SEC from using any evidence obtained through its misuse of the Traders Café FOI for any purpose in any future proceeding.

Dated:   New York, New York
         February 08, 2019

FORD O'BRIEN LLP

_____
Adam C. Ford
575 Fifth Avenue
17th Floor
New York, NY 10017
aford@fordobrien.com
(212) 858-0040
NJ Attorney ID: 017772002

*Attorney for Plaintiff Guy Gentile*