**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GUY GENTILE,

               Plaintiff,

               v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

             Defendant.

Case No.:  2:19-cv-05155 (JLL/JAD)

(ECF)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE COMMISSION'S MOTION TO DISMISS AND IN REPLY TO THE COMMISSION'S OPPOSITION TO GENTILE'S MOTION FOR A PRELIMINARY INJUNCTION**

Ford O'Brien LLP
Adam C. Ford, Esq.
575 Fifth Avenue, 17th Floor
New York, NY 10017
Telephone No: (212) 858-0040
Email: aford@fordobrien.com

*Attorney for Plaintiff Guy Gentile*

April 15, 2019

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT....................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 7

LEGAL ARGUMENT .................................................................................................... 16

I.   The Plain Language of the Administrative Procedure Act ("APA") Waives the SEC's
     Sovereign Immunity in This Specific Case Given the Undisputed Facts Alleged in the
     Complaint.................................................................................................................. 16

     A.  The SEC's conduct –investigating Gentile without having obtained Commission
         authorization under 78u(a) – is not agency action committed to agency discretion
         by law…………………………………………………………………………19

     B.  No other limitations preclude judicial review under the APA ..........................20

         1. The SEC's "first to file" argument does not apply to different cases involving different
            parties and is disingenuous because this Court's grant of jurisdiction to hear Gentile's
            complaint did not arise until the SEC filed a subpoena enforcement action ..................22

II.  Venue Is Proper in This Court Because the Commission's Wrongful Conduct Damaged
     Gentile Here ..............................................................................................................23

III. Gentile's Claim Entitles Him to the Relief He Seeks ...............................................24

IV.  Gentile Is Entitled to a Preliminary Injunction .......................................................25

     A.  Gentile is likely to succeed on the merits of his claim and can show irreparable harm.......25

     B.  The balance of the equities and public interest weighs in favor of granting Gentile's request
         for a preliminary injunction..................................................................................26

CONCLUSION................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Arjent LLC v. U.S. S.E.C.*,
  7 F. Supp. 3d 378 (S.D.N.Y. 2014) ................................................................. 21

*BK Instrument, Inc. v. United States*,
  715 F.2d (2d Cir.1983) ................................................................................... 17

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................................... 16

*E.E.O.C. v. Univ. of Pennsylvania*,
  850 F.2d 969 (3d Cir. 1988) .......................................................................... 22

*Gupta v. S.E.C.*, 796 F. Supp.,
  2d 503 (S.D.N.Y. 2011) ................................................................................. 16

*Jaffee v. United States*,
  592 F.2d 712 (3d Cir. 1979) ..................................................................... 16, 17

*Int'l Waste Controls, Inc. v. Sec. & Exch. Comm'n*,
  362 F. Supp. 117 (S.D.N.Y.) .......................................................................... 17

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C.Cir.2006) .......................................................................... 16

*Sec. & Exch. Comm'n v. Huff*,
  No. 08-60315-CIV, 2009 WL 10667890, at *6 (S.D. Fla. Oct. 8, 2009) ................... 17

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
  648 F.2d 118 (3d Cir. 1981) ................................................................... 1, 5, 17

*Sharkey v. Quarantillo*,
  541 F.3d 75 (2d Cir.2008) .............................................................................. 16

*Sprecher v. Graber*,
  716 F.2d 968 (2d Cir. 1983) ...................................................................... 17, 20

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) .................................................................................. 18, 20

*Upstate Federal Credit Union v. Walker*,
  198 F.3d 372 (2d Cir.1999) ............................................................................ 16

**<u>Statutes</u>**

15 U.S.C. § 78u(a)(b) ............................................................................................ *passim*
17 C.F.R. § 202.5(a) (1980)..................................................................................*passim*
28 U.S.C. §1331.............................................................................................................. 16
28 U.S.C. § 1391 ............................................................................................................23

## PRELIMINARY STATEMENT

This Court has the jurisdiction, venue, and legal and factual basis to issue a preliminary injunction now and ultimately preclude the SEC permanently from issuing subpoenas and conducting an investigation into Guy Gentile and SureTrader *under an unrelated Formal Order of Investigation* ("FOI") because Congress has precluded the Commission from doing so and authorized federal district courts to prevent agencies from violating constitutional rights and abusing the courts' process. Contrary to the Commission's misleading premise, Gentile *does not* argue the Commission cannot investigate him or SureTrader, or that he can limit how the SEC conducts its investigations that the Commission has authorized. All that Gentile demands here is that the Commission and its Staff not violate the law if it wishes to harass or investigate him.

To put all our cards face up on the table, this case rises or falls on the question of whether the 2014-to-present Miami investigation into Gentile and SureTrader is "reasonably relevant" to the investigation authorized in the Traders Café FOI.  Under 17 C.F.R. § 202.5(a) and 15 U.S.C. § 78u(a)–(b), the Commission can authorize and conduct a "formal investigation" in which a court's process is used only if "it appears from information obtained that there is a likelihood that a violation has been or is about to be committed and that the issuance of process may be necessary."  *SEC v. Wheeling-Pittsburgh Steel Corp.,* 648 F.2d 118, 125 (3d Cir. 1981).  After obtaining an FOI authorizing a specific investigation, the SEC staff may only serve subpoenas and take other investigatory steps if it is "reasonably relevant to an authorized investigation and the demand is not too indefinite" – as the Commission acknowledges.  (SEC brief, pg. 7 filed in *SEC v. Marin,* 1:19-mc020493, Dkt. 16, citing *United States v. Morton Salt*, 338 U.S. 632, 652 (1950) Ford Dec. ¶ 4, Ex.1).

Understanding this posture, the Commission includes exactly two sentences to support its factual position that the Miami investigation into Gentile is "reasonably relevant" to the Trader's

Café FOI.  The Commission informs this Court that the investigations occurring in Miami revealed:

> …that Traders Café, a U.S.-based day trading firm, maintained a master account at SureTrader, the former name of Swiss America (which is now known as MintBroker International Limited).[1] The Miami investigation also revealed that Swiss America and Gentile transferred U.S. customer funds from overseas to the U.S. bank account at Wells Fargo for Marin's Company, Mint Custody.

(SEC Br. pg. 27-28)

The Commission then proclaims that "Gentile cannot reasonably dispute the relevance of those accounts and transactions to the investigation of Trader's Café." This is an intentionally misleading juxtaposition of two entirely unrelated statements, the second one of which is false anyway. The Commission has in its possession all the Wells Fargo bank statements and those statements make clear that Swiss America never transferred any funds from overseas to the U.S. bank account at Wells Fargo. But if such a transfer was made, it would have absolutely nothing to do with Traders Café or the investigation it authorized into it. The Traders Café master account at SureTrader that the Traders Café investigation "revealed" was only opened for several months in 2012, hardly held any cash or securities, was one of tens of thousands of unremarkable accounts at SureTrader, was not part of the securities violations the Traders Café principals pleaded guilty to nor was it otherwise connected to any misconduct whatsoever, and was closed by SureTrader in April 2013 for insufficient funds. Moreover, also as the Commission knows, the Wells Fargo account owned by Mint Custody referenced in the second sentence was not opened for another three years after the Traders Café account was closed and never transferred any funds (customer or other) whatsoever to the United States, let alone to anyone connected to Traders Café or otherwise related to that investigation. The Wells Fargo account in question was closed in 2017 and SureTrader filed all necessary tax returns with the IRS. Not only can Gentile

---

[1] For simplicity, the broker-dealer is referred to as "SureTrader" throughout this brief.

reasonably dispute the relevance of those accounts to the Traders Café FOI, he can prove beyond any doubt that they have no connection or relevance whatsoever.  Indeed, when the Assistant Regional Director out of the Miami Regional Office testified in support of the SEC Staff's motion to compel compliance, not even she attempted to suggest that "those accounts and transactions" were related to Traders Café.

The Commission also asserts that it is investigating "movement of customer funds" but without even attempting to link this part of its inquiry to the Traders Café FOI. But the Commission cannot argue in good faith that it is investigating the "movement of customer funds" between SureTrader and the United States since SureTrader is an approved Qualified Intermediary with the IRS, and a member of the Foreign Account Tax Compliance Act ("FATCA"), in full compliance with its reporting and other regulatory requirements.  As such, SureTrader is lawfully permitted to service United States clients (so long as it does not solicit them, which it does not) and to transfer the money of its United States customers through the United States. To suggest otherwise to this Court in support of its unauthorized investigation is troubling, to say the least. If the Commission is now asserting that unregistered foreign broker-dealers cannot transfer *any* customer funds through the United States – even those that are specifically registered and permitted to do so with the IRS and through FATCA – this should be announced in a manner other than in this investigation.[2] Of course, the Commission is not really taking this novel position: it is just using this "movement of funds" as a pretext to "investigate" Gentile.

---

[2]  After all, as the Washington Post reports, over one-third of all United States stocks are owned by foreigners, the overwhelming majority of which are traded through foreign, unregistered broker-dealers. *See* www.washingtonpost.com/news/politics/wp/2017/10/24/the-asterisk-that-accompanies-the-gains-in-the-stock-market-a-third-of-the-shares-are-owned-by-foreigners (*last visited* April 14, 2019).

In theory, given the broad discretion Congress and the courts have granted the Commission in instituting and conducting investigations in any manner it sees fit, the Commission could have pursued its endless "investigation" of Gentile and lawfully investigated him, had they simply followed the SEC's own internal procedures and statutory law and obtained an FOI authorizing it.  To be sure, the Commission could end *this litigation* if it possesses – as it claims to have – evidence which would allow the Commission to authorize an investigation into Gentile and SureTrader pursuant to its statutory authority, and issue an FOI that is "reasonably relevant" to the subject matter of the "Miami investigation." But notwithstanding this litigation (and the two subpoena enforcement actions in the United States District Court for the Southern District of Florida in Miami), the Staff have still not obtained an authorizing FOI.  The Commission instead has elected to proceed under an old, outdated FOI having nothing relevant to do with Gentile or any of his companies in blatant violation of 17 C.F.R. § 202.5(a) and 15 U.S.C. § 78u(a)–(b).  This incomprehensible posture strongly suggests that SEC Staff do not possess any evidence suggesting Gentile or SureTrader has, is about to, or is engaged in a securities violation, and certainly not related to any authorized investigation, thus entitling Gentile to the preliminary injunction relief that he seeks.

Against this background, the SEC presents this Court with a motion to dismiss that entirely ignores the central issue of this case. Instead, the Commission seeks to obfuscate the matter by focusing almost exclusively on baseless, non-substantive issues of jurisdiction and venue. But the question of whether this Court – or any court – has the authority to preclude the Commission from abusing judicial process has already been answered affirmatively by the Supreme Court, and every circuit court to consider this question. Specifically, the Third, Second, and Eleventh Circuits have concluded that courts retain the jurisdiction to stop such abuse of process where the investigation is not relevant to any authorized investigation.  Indeed, given

that the Third Circuit in *SEC v. Wheeling-Pittsburgh Steel Corp.* set forth the applicable procedure for a hearing including discovery (when appropriate) for claims that an SEC investigation is unauthorized and should be quashed, the SEC's primary argument that this matter is barred by sovereign immunity should be dismissed out of hand.

It is not in dispute that section 702 of the Administrative Procedures Act waives sovereign immunity in claims against government agencies for declaratory relief (not money damages, which are barred) – such as that sought here. The two exceptions highlighted by the Commission in its brief are inapplicable to this case.  First, since there is no authorized investigation into the subject matter or subjects of the "Miami investigation" and it seeks information not "reasonably relevant" to any authorized investigation, agency discretion is not in play.  Therefore, the Commission's claim of sovereign immunity based on agency discretion fails. Had the Commission authorized an investigation into Gentile or SureTrader or if the investigation into them was "reasonably relevant" to the Traders Café FOI (or any other authorized investigation), these discretionary protections would have kicked in, and this claim might be barred by sovereign immunity – but that is not the case here.  Second, Section 78u(c), cited by the Commission, does not provide the exclusive mechanism to challenge the investigation.  Indeed, this provision contains no language remotely suggesting that result (nor does any other statutory provision), and the past forty years of Supreme Court and Circuit Court jurisprudence permits claims against government agencies for declaratory relief when rights have been violated.  There is, in other words, no other bar to judicial review overruling the plain language of Section 702. The Commission's cases on this point are inapposite.

The Commission spends an inordinate amount of time attempting to distort history arguing that the "Miami investigation" is unrelated to the "New Jersey investigation" to support its position that venue is improper in this Court.  The Court can also dismiss these arguments

outright. Venue here is unquestionably proper. The question of whether Gentile and SureTrader were violating the securities laws during 2012-2018 was a central issue in his cooperation agreement with the DOJ and the Commission, and a central issue under investigation by the Staff in the New York Regional Office and the DOJ in Newark, where Gentile frequently met with the Commission's Staff to discuss SureTrader and its activities. Gentile discussed SureTrader and its client base with the SEC and DOJ for four years in connection with the "New Jersey Investigation." For avoidance of doubt, SureTrader and its activities was a central issue in the Complaint and Amended Complaint litigated in this Court, and indeed the Commission's allegations regarding SureTrader's conduct caused him damage here in this district. As Your Honor may recall, the Staff made repeated references about Gentile being likely to engage in violations of the securities laws through his Bahamian broker-dealer, including in its March 2016 Complaint, the October 2017 Amended Complaint, and its briefing arguing in favor of a stay and against the motion to dismiss, all of which make frequent use of the fact that another investigation out of Miami was ongoing and that facts were used to support its litigation position that the Commission was entitled to injunctive relief in that case.[3] Despite the SEC's assertion, the record in this case, of which this Court is particularly well aware, belies the SEC's recent brief suggesting that the investigation being conducted here in New Jersey only involved KYUS and RVNG in 2007-2008 and nothing else.

Indeed, having been told by the Commission that it was investigating Gentile and SureTrader out of its Miami office, this Court may also recall that it asked the Commission in its

---

[3] To be sure, Gentile solicited United States customers and opened bank for U.S. customers of SureTrader, *but did so only upon the direct instruction and full knowledge of the DOJ and SEC*, whose representatives made repeated trips to SureTrader as they used the broker-dealer for their numerous successful investigations. It is unclear if the Miami investigation "uncovered" Gentile soliciting U.S. customers, but did not know it was under the direct instruction of the government in connection with his cooperation with the New York Regional Office.

order dated September 18, 2017 – after the Commission's New York Staff had been investigating him for five full years, and its Miami Staff had been investigating him for four years – to inform this Court if the Commission had any additional evidence that Gentile was violating the securities laws after June 2008. [Dkt. 46]. The Commission told this Court last year that it was entitled to injunctive relief because Gentile owned SureTrader and it was currently under investigation out of Miami. The issue of this unauthorized investigation was then litigated in this Court as Gentile argued that the Commission had insufficient evidence to establish its request for injunctive relief. Having heard this issue, the Court dismissed the Amended Complaint. The Commission's unauthorized investigation of Gentile damaged him, here, in this Court, by forcing him to respond to Commission allegations based on it and litigate the issue before this Court, making venue proper here.

## FACTUAL BACKGROUND[4]

On March 19, 2019, Magistrate Judge John O. Sullivan of the United States District Court for the Southern District of Florida conducted a hearing in connection with the SEC's motion to compel subpoena recipient Carla Marin, an attorney for Guy Gentile, to comply with the subpoena it issued to her seeking documents specifically regarding Gentile under the Traders Café FOI. (Ford Dec. ¶ 10, Ex. 7) During that hearing, the Associate Regional director of the Miami Regional Office, Jessica Weissman, testified in no uncertain terms that neither Gentile, Marin, or SureTrader had any relationship to Traders Café. Her testimony makes clear that neither Gentile nor SureTrader were involved in the Traders Café offering of unregistered securities, nor did they know about the offering. Nor should they have known about it since that securities fraud was not perpetrated through an account at SureTrader. In fact, there is absolutely

---

[4] This brief assumes familiarity with Gentile's cooperation agreement with the DOJ and SEC, and the prior litigations involving those parties, as well as familiarity with the prior filings in this case.

no connection between SureTrader and Trader's Café, other than – the sole fact upon which the SEC argues its right to investigate Gentile and SureTrader pursuant to that FOI – that Trader's Café "maintained a master account" there.  But that out of context statement is misleading. The Traders Café account at SureTrader, which never held more than several thousand dollars, was only open for a few months at the end of 2012, *and was closed by SureTrader in April 2013* for insufficient funds.  (Ford Dec.¶ 5, Ex. 2). Nevertheless, Weismann asserted that the Commission's authority to investigate Gentile is premised on the Traders Café investigation "opening the door" to investigate Gentile because the SEC learned during the Traders Café investigation that SureTrader was soliciting United States clients in 2014, in violation of Section 15(a) of the Securities and Exchange Act of 1934, in 2014, about 18 months after the Traders Café account at SureTrader was closed.

The SEC also tells this Court in its brief that it is investigating "the movement of customer funds" (SEC Br. pg. 7) from SureTrader to Mint Custody.  But this is a red herring for several reasons. First, these movements of funds are alleged to have taken place four years after SureTrader closed the Traders Café's account, and neither Gentile nor SureTrader had anything further to do with Traders Café or its principals. (Ford Dec. ¶ 5, Ex. 2). More importantly, there is nothing remotely suspicious (or violative of the securities laws) about an unregistered broker-dealer transferring its own funds to or from the United States or to its customers in the United States.  As the SEC acknowledges, the governing statute precludes "solicitation" of U.S. customers, it does not preclude broker-dealers servicing its *unsolicited* U.S. customers that voluntarily opened accounts.  The statute explicitly notes that the impetus behind the regulations was to ensure U.S. customers were protected w*ithout precluding unregistered broker-dealers from conducting business with U.S. customers that affirmatively found such broker-dealers and opened an account with them*.  In other words, the governing statute was enacted to encourage

commerce between unregistered broker dealers and U.S. customers, and it explicitly does not prohibit it. See Exchange Act § 15(a)(2); Rule 15a-6; Registration Requirements for Foreign Broker-dealers, Exchange Act Release No. 27017 (July 11, 1989), 54 Fed. Reg. 30013, 30020 (July 18, 1989) ("Adopting Release").[5]  Indeed, both FINRA and the IRS explicitly authorized SureTrader to operate in the manner that it has, including authorizing SureTrader to send customer funds to the United States. (Ford Dec. ¶ 6, Ex. 3).

Significantly, during the time of his cooperation, whether Gentile and SureTrader were violating Rule 15 was a central issue with the New York Regional Office and significant to the "New Jersey investigation."  Indeed, in 2013, while Gentile was cooperating with the Commission, FINRA opened a full investigation into the question of whether Gentile or SureTrader was soliciting U.S. customers.  Under the terms of his cooperation agreement, both the DOJ and SEC were immediately informed of FINRA's formal inquiry which raised the prospect of Gentile violating the securities laws during his cooperation. Both the DOJ and SEC asked Gentile numerous questions on this very topic and satisfied themselves that SureTrader and Gentile were in full compliance with all securities laws.  On January 10, 2014, Gentile submitted a Wells submission to FINRA (also provided to the government) setting forth why any

---

[5] Foreign broker-dealers are permitted to engage in securities transactions with or on behalf of U.S. persons without registering with the Securities and Exchange Commission so long as the broker-dealer did not solicit the U.S. customer. In adopting this exemption, the Commission sought to avoid a regulatory scheme in which foreign broker-dealers "refuse to deal with U.S. persons under any circumstances." Indeed, the Commission's policy since the late 1980s has been to foster the ability of U.S. customers to benefit from the "increasing internationalization of the securities marketplace," and the steadily increasing "desire of investors to trade in financial markets around the world." The Commission was clear that the unsolicited trades exemption of Rule 15a-6 should foster the ability of U.S. investors to seek out opportunities to utilize the services of foreign broker-dealers, and that foreign broker-dealers should not believe they are prohibited from dealing with U.S. investors under any circumstances.

allegation that his company was soliciting U.S. customers failed as a matter of law.  (Ford Dec. ¶

7, Ex. 4).  In that submission, Gentile explained that:

> Foreign broker-dealers are permitted to engage in securities transactions for or on behalf
> of U.S. persons, so long as the foreign broker-dealer does not affirmatively solicit the
> customer. Swiss America, through its Director and Chief Compliance Officer – not
> Gentile – followed the letter of the law and all available SEC guidance regarding
> soliciting U.S. persons, and took every reasonable step to comply with these rules and
> guidance. Specifically, once Swiss America decided it would start accepting unsolicited
> United States investors as customers, the company's Chief Compliance Officer:
>
> > 1. Set up an internal infrastructure that included strict policies and practices to
> > prevent solicitation of U.S. customers;
> >
> > 2. Redesigned the SureTrader website to include a pop-up blocker that prohibits
> > U.S. customers from accessing any substantive information contained in it;
> >
> > 3. Redesigned the website so that every page carries a bold, unambiguous
> > warning that Swiss America is not intended for and does not service U.S.
> > customers;
> >
> > 4. Drafted new account opening documents which preclude opening an account
> > for any potential new customer who might be a U.S. person, unless the Chief
> > Compliance Officer determines that person was not solicited by Swiss
> > America in any way; and
> >
> > 5. Drafted and maintains new account opening documents that require all U.S.
> > persons to truthfully confirm that they affirmatively reached out to Swiss
> > America without Swiss America having done anything affirmative to solicit
> > that customer.

These prophylactic measures were designed and implemented with the assistance of no

fewer than five lawyers.  (Ford Dec. ¶ 11).  Again, both the DOJ and SEC were informed of the

steps SureTrader took to ensure it could not be accused of soliciting U.S. customers.[6] These facts

are a complete defense to any allegation that SureTrader violated (or is currently violating) Rule

15.  FINRA agreed, and on April 14, 2015, FINRA Enforcement Staff sent Gentile a letter noting

---

[6] The government told Gentile that part of a benefit of his cooperation agreement included his
ability to continue to operate SureTrader under government supervision.

that Enforcement staff "has determined not to recommend the commencement of a disciplinary action against Gentile…" (Ford Dec. ¶ 8, Ex. 5).

Immediately after Gentile notified the government that FINRA had determined there was insufficient evidence to warrant an enforcement action alleging SureTrader was soliciting United States customers, the Commission's Miami office began issuing subpoenas to investigate the question of whether Gentile or SureTrader were soliciting U.S. customers.

The Commission is now on record asserting that it first began investigating Gentile and SureTrader because it learned that he was soliciting U.S. customers in violation of securities laws at least as early as five years ago, in 2014.  As alleged in the Complaint and supported by documentary evidence, SEC Staff counsel told Gentile's attorney in March 2016 that he believed they had evidence that Gentile was soliciting U.S. customers at that time, and the same was said to Gentile's counsel in October 2017.[7]   (Ford Dec.¶12)  Then, this past month, counsel for the SEC argued before the judge in Miami that there was an "ongoing" violation of the securities laws going on "right now" with "a potential ongoing, as we speak, as we stand here today, violation of the federal securities laws by soliciting people in the United States to participate and do business with an unregistered foreign broker-dealer." (Ford Dec. ¶ 9, Ex. 6, at pg. 28). Meanwhile, as this Court is aware, the Commission has been simultaneously telling this Court, that it is not in possession of any information suggesting Gentile has engaged in any alleged

---

[7] At this time, Gentile's counsel asked SEC staff attorney Sajjad Matin what exactly Gentile was doing that the SEC believed was in violation of the securities laws, because, as the SEC was repeatedly told, given his experience with the DOJ and SEC over the prior five years, he had absolutely no desire to engage in any conduct that could be remotely questionable. But Matin refused to disclose what specific conduct the SEC was concerned with, except to confirm it was only conduct post-March 2016.  (Ford Dec.¶11)  In other words, when Gentile specifically asked two years ago what he was doing that made the Miami Regional Office believe he was violating the securities laws so that he could stop, no answer was given.

violation of the securities laws except for the conduct listed in the Amended Complaint filed in this Court, specifically allegations that Gentile made public statements critical of the agency.

Despite the Commission's representations to *this Court* that it is not aware of evidence suggesting Gentile violated any securities laws as late as last year, the Commission told a different story to the Miami District Court, testifying that the Commission apparently actually believes he has been violating the securities laws non-stop since at least 2014 by virtue of his Bahamian broker-dealer soliciting U.S. customers.  This claim is dubious since it is implausible for the Commission to assert now that it did not inform this Court of information it had in its possession that Gentile was violating the Securities laws – after this Court ordered it to be presented to save its Amended Complaint from dismissal – because that information came from a "separate investigation."[8]  In any event, rather than file a complaint at any point in the past five years of this "ongoing violation" or move to compel Gentile to comply with the various subpoenas served on him under the Traders Café FOI, as would be consistent with its Congressional mandate of protecting investors, *the SEC waited five years* after first "discovering" this "ongoing" securities law violation to file two subpoena enforcement actions in the District Court for the Southern District of Florida against Gentile's personal attorney, Carla Marin, and a company Gentile owns, MinTrade Technologies.  See *SEC v Marin* (Case No. 19-mc-20493-UU); *see SEC v. MinTrade* Technologies, LLC, (Case No. 1:19-mc-20496-KMW). In

---

[8] The Commission explicitly asserted that it would inform this Court if any information obtained from the Miami Investigation was relevant to the New Jersey litigation. Since evidence of Gentile violating the securities laws for the past five years would have been quite relevant to this Court's analysis in deciding Gentile's motion to dismiss, the only rational conclusion is that the Commission is not actually in possession of any evidence of wrongdoing by Gentile or SureTrader.

connection with the Marin subpoena enforcement action, Magistrate Judge O'Sullivan held a hearing on March 19, 2019.[9]

Assistant Regional Director Jessica Weissman did *not* testify that the movement of funds in 2016 from SureTrader to the Wells Fargo account was related to the Traders Café master account that closed in April 2013. Rather, she testified that there is no connection between the investigation into Gentile and SureTrader and Traders Café (other than the existence of that long closed account), but that there does not have to be any connection between the authorized investigation and the "Miami investigation" because that authorized investigation "opened the door" to SEC Miami investigating Gentile and SureTrader. The full exchange between the Miami judge, counsel for Marin, and Weissman is critical to understanding that the SEC has been operating contrary to law, apparently based on a misunderstanding of the SEC's authority to investigate. The critical passages are on pages 88-91 of the March 19 hearing transcript.

> The Court: [] It is a simple question. How is the subpoena
> addressed to Ms. Marin and her company related to the order
> allowing the investigation of Traders Cafe?
>
> THE WITNESS [JESSICA WEISSMAN]: Yes. In connection with the Traders
> Cafe investigation, as I just stated, we uncovered information [in 2014]
> to lead us to believe that SureTrader was soliciting U.S.-based
> customers in violation of Section 15a of the Exchange Act of
> 1934 as highlighted in number (C) of Exhibit B, the formal
> order of investigation.
> []
> BY MR. BERKELEY:
> Q. Why didn't you seek a new FOI?
> Because clearly SureTrader has nothing to do with Traders Cafe.
> That is a separate entity, correct?
> MS. BERLIN [COUNSEL FOR SEC]: Objection, your Honor. Relevance.
> MR. BERKELEY: The relevance is creating the logical
> nexus between Traders Cafe --
> THE COURT: The objection is overruled.

---

[9] The statute of limitations has expired for the conduct that the government now alleges forms the basis of the investigation into Gentile, and the entire statutory framework supports a finding that Congress did not intend to permit the Commission from investigating subjects for a time frame beyond the statute of limitations.

Go ahead.
BY MR. BERKELEY:
Q. Is Guy Gentile a member of Traders Cafe?
A. Not to my knowledge.
Q. Is Swiss America an officer or a member of Traders Cafe?
A. Not to my knowledge.
Q. Is Carla Marin a member or officer of Traders Cafe?
A. I don't know.
Q. So the subject of the subpoena --
A. I didn't get to answer your question.
Q. -- Traders Cafe --
A. There was a pending question that the judge overruled and
you asked another question without allowing me to answer the
question that was still pending.
THE COURT: What question?
THE WITNESS: Why didn't I seek a new formal order?
THE COURT: OK.
THE WITNESS: It is not a requirement to seek a new
formal order.
BY MR. BERKELEY:
Q. The judge did sustain the objection. But regardless, in
trying to figure out the answer to the judge's question, which
is the logical nexus, the relation as required under the
statute, you are seeking information from people that have
nothing -- that are not officers or representatives of Traders
Cafe. Is that correct?
A. That's not a requirement.
Can you point me to the requirement in law that
requires that we subpoena only people related to the title of
an investigation?
Q. We can have that conversation afterwards, but right now
you're the one on the witness stand and I'm trying to extract
information from you as to how the Traders Cafe FOI is relevant
to Guy Gentile, Swiss America or Mint Custody, which is the
subject matter of the subpoena.
A. The Traders Cafe investigation opened the door to the
conduct that we are currently investigating, as I previously
stated, that there was evidence that suggested that SureTrader,
known as Mint Broker International, was soliciting U.S.-based
customers in violation of Section 15a of the Exchange Act
without being registered with the Commission.
Q. But U.S.-based customers, do you have any idea if it
relates to Traders Cafe?
A. There is no requirement for that.
Q. So then you can use this FOI, this formal order of
investigation, to investigate anything that the SEC deems fit
and necessary?
A. I didn't say that.

Q. So then there must be a legitimate purpose and there must
be a relation to it, correct?
A. Yes, and I just told you that in connection with the
Traders Cafe investigation we uncovered evidence that, as we
are allowed because our investigations are fact-finding
missions and we seek to find any violations of the federal
securities laws, that opened the door to the conduct that we
are looking at now. And again, 1(C) of the formal order.
Q. One(C). Can you show me – you're talking about Exhibit
No. 1, subsection (C)?
A. Yes, the formal order.
Q. And that relates to Traders Cafe, its officers, directors,
employees, partners, subsidiaries and/or affiliates or other
persons or entities, correct?
A. That's what the formal order states, yes.
Q. So is Carla Marin an officer, director, employee, partner,
subsidiary and/or affiliate of Traders Cafe?
MS. BERLIN: Objection. Asked and answered.
THE COURT: Overruled.
A. Again, it's very uncommon to find an individual in a formal
order, and you will see if we look back through the history of
time of enforcement that entities and individuals not listed in
the formal order can be charged legally and properly by the
SEC.
Q. Well, I understand that's your testimony. I'm just looking
for evidence of that.
Is Guy Gentile an officer, director, employee,
partner, subsidiary or affiliate of Traders Cafe?
A. Not to my knowledge.

Weissman's testimony contradicts Section 78u(a) and Section 202.5 and demonstrates the

Commission's Staff has not acted in accordance with them.  Both sections provide only that the

Commission may authorize an investigation only if they are presented with evidence suggesting

a possible violation of the securities laws and the investigative steps taken by Staff are

"reasonably relevant" to the authorized investigation as set forth in the FOI.[10] While it is true that

once a formal investigation is started the staff have broad discretion to investigate everything and

everyone reasonably relevant to the authorized investigation, Weissman testified that the SEC

---

[10] Even the Commission's General Counsel's office understands this, as they admit in their
written submissions to this Court that for subpoenas to be enforceable, they must be "reasonably
relevant" to the authorized investigation.

Miami Staff was not required to either obtain a new FOI, or even prove that the subpoenaed documents were "reasonably relevant" to an authorized investigation. Weissman instead testified in support of the legal argument that the SEC may investigate anyone and anything it wants so long as an authorized investigation "opens the door" to new areas of inquiry.[11]

## LEGAL ARGUMENT

### I.   The Plain Language of the Administrative Procedure Act ("APA") Waives the SEC's Sovereign Immunity in This Specific Case Given the Undisputed Facts Alleged in the Complaint

The Commission asserts that "Gentile has not identified and cannot identify a waiver of the Commission's sovereign immunity that would authorize this litigation" (SEC Br. pg. 15), yet acknowledges immediately thereafter that "Section 702 of the APA is invoked when a party seeks non-monetary relief against the United States and claims that 'an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.' (5 U.S.C. § 702)."  Indeed, section 702 further provides that such a suit "shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."   As such, section 702 of the APA is the basis for showing a waiver of sovereign immunity, permitting claims against the government under 28 U.S.C. § 1331 and 15 U.S.C. § 78u.

By its plain language, Section 702 waives sovereign immunity for actions against an agency, such as Gentile's action here, that seek relief other than money damages. *Gupta v. S.E.C.*, 796 F. Supp. 2d 503, 509 (S.D.N.Y. 2011) (citing *Bowen v. Massachusetts,* 487 U.S. 879,

---

[11] On April 4, 2019, Gentile sought to intervene in both actions in Miami to protect his interests given that he was named in both subpoenas and has a legally protectable interest in the subpoena enforcement actions.  The SEC *opposed* Gentile's motion to intervene as of right and with permission. His motions to intervene remain *sub judice* before Magistrate Judges John O'Sullivan and Judge Edwin G. Torres.

893 (1988). Moreover, "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not" because Section 702 "waives sovereign immunity for [any] action in a court of the United States seeking relief other than money damages," not solely for an action brought under the APA. *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 186 (D.C.Cir.2006) (citations omitted). *See also Sharkey v. Quarantillo,* 541 F.3d 75, 91 (2d Cir.2008) ("Section 702 of the APA waives the federal government's sovereign immunity in actions for non-monetary relief against an agency or officer thereof brought under the general federal question jurisdictional statute.") (citation, quotation marks, and brackets omitted); *Upstate Federal Credit Union v. Walker,* 198 F.3d 372, 375 (2d Cir.1999) (unless exceptions in last sentence of Section 702 apply, "the APA does create a general waiver of sovereign immunity as to equitable claims against government agencies").[12]

The Second, Third, and Eleventh Circuits have all ruled that district courts have jurisdiction to hear challenges of unauthorized SEC investigations. See *Jaffee v. United States*, 592 F.2d 712, 718 (3rd Cir. 1979) (5 U.S.C. § 702 provides a waiver of sovereign immunity when a proper action is brought under 28 U.S.C. § 1331, indicating that § 702, "when it applies, waives sovereign immunity in 'nonstatutory' review of agency action under section 1331"); *SEC*

---

[12] Legislative history supports these holdings.  As the Third Circuit explained in *Jaffee v. United States*, 592 F.2d 712, 718–19 (3d Cir. 1979): "As the House Report shows, Congress amended section 702 with a specific purpose of waiving sovereign immunity in equitable actions brought under section 1331. The Report notes that acts of the older executive departments, such as the Department of Defense, are subject to judicial review only through "nonstatutory" suits under section 1331. H.R.Rep.No.94-1656, 94th Cong., 2d Sess. 5, Reprinted in *719 (1976) U.S. Code Cong. & Admin. News, pp. 6121, 6125. Having reviewed the injustices of sovereign immunity in these nonstatutory actions, the Report concludes "that the partial elimination of sovereign immunity, as a barrier to nonstatutory review of Federal administrative action" would not unduly interfere with federal agencies. *Id*., H.R.Rep. at 9, U.S. Code Cong. & Admin. News at p. 6129 (emphasis supplied). By waiving sovereign immunity in suits for "relief other than money damages," Congress sought to "facilitate nonstatutory judicial review of Federal administrative action . . . ." *Id*. H.R.Rep. at 19, U.S.Code Cong. & Admin.News at p. 6140. It was therefore precisely for equitable actions under section 1331 that Congress enacted the amendments to section 702.

*v. Wheeling-Pittsburgh Steel Corp.,* 648 F.2d 118, 125 (3d Cir. 1981); (authorizing claim against

SEC for unauthorized investigation); *Int'l Waste Controls, Inc. v. Sec. & Exch. Comm'n*, 362 F.

Supp. 117, 120 (S.D.N.Y.), *aff'd*, 485 F.2d 1238 (2d Cir. 1973) ("thus, the jurisdiction of this

Court to entertain suits to enjoin SEC investigations is predicated on allegations to the effect that

the SEC 'has plainly exceeded its statutory authority or threatens irreparable injury in clear

violation of an individual's rights.'");[13]  Pursuant to the Second Circuit's *Sprecher*, cases

challenging the validity of the SEC's investigatory motives or methods *first require that the SEC

must have sought court enforcement of a subpoena in the investigation at issu*e. See *Sec. & Exch.

Comm'n v. Huff*, No. 08-60315-CIV, 2009 WL 10667890, at *6 (S.D. Fla. Oct. 8, 2009). In other

words, once the Commission invokes a district court's process to enforce a subpoena, the

Commission waives its sovereign immunity and opens itself up to suit. But this holding does not

amount to a limitation on judicial review under Section 702 of the APA.  Indeed, *Sprecher* was

decided decades after Section 702 was drafted, a fact that precludes finding that Congress

intended to bar judicial review of unauthorized investigations that seek to use judicial process.

  This conclusion is also consistent with Supreme Court guidance and rationale underlying

the Act. As the Supreme Court has explained, the Administrative Procedure Act was drafted

during a time of rapid expansion of administrative agencies and administrative process. Its entire

purpose was to act as a check upon "administrators whose zeal might otherwise have carried

them to excesses not contemplated in legislation creating their offices."  *United States v. Morton

Salt Co.,* 338 U.S. 632, 644 (1950).  The Act created safeguards, in addition to constitutional

---

[13] Moreover, the relationship between Section 702 and actions brought under section 1331 was
once the subject of a disagreement between the Second and Third Circuits, but that disagreement
was resolved when the Second Circuit agreed that section 702 waives immunity where a proper
action is brought under 28 U.S.C. § 1331. *BK Instrument, Inc. v. United States,* 715 F.2d 713 (2d
Cir.1983). *See Sprecher v. Graber*, 716 F.2d 968, 973–74 (2d Cir. 1983).

ones, against arbitrary official encroachment on private rights. *Id.* The entire thrust of the Act is to protect citizens from overzealous administrators.

Notwithstanding this, the SEC argues that Section 702 provides two exceptions that preclude any finding of waiver of sovereign immunity here: (1) that the SEC cannot be sued because the APA does not apply to the extent "agency action is committed to agency discretion by law" and (2) Section 702 does not affect other limitations on judicial review. Neither of these exceptions are credible arguments given the undisputed fact (and certainly the allegation in the Complaint) that the agency action complained of is not committed to agency discretion because it is plainly unauthorized by statute and no other limitation precludes judicial review here.

**A. The SEC's conduct –investigating Gentile without having obtained Commission authorization under 78u(a) – is not agency action committed to agency discretion by law**

The violation of rights alleged in Gentile's Complaint has nothing to do with agency discretion. Had the SEC issued an FOI authorizing an investigation into Gentile or SureTrader, or if the SEC's investigation and document and testimony subpoenas even arguably related to the investigation authorized in the Traders Café FOI, those may be deemed discretionary acts.  But here, the SEC Staff has issued subpoenas and is conducting an investigation of Gentile that is entirely unrelated to the agency's discretionary act of authorizing an investigation of him, or of investigating activities reasonably relevant to the investigation authorized in Traders Café. Obviously, when SEC staff members are acting outside of their Congressional grant of authority, they are acting outside of the SEC's discretionary investigative powers.  Yet every case cited to by the SEC in its brief involves a discretionary determination by the Commission authorizing an investigation that forms the predicate of the underlying subpoenas (and challenges). Here, unlike the cases cited by the SEC, Gentile is asserting that the "Miami investigation" of him and his company, as well as the subpoenas at issue, are entirely unrelated to any authorized

investigation, making each of the Commission's cases that it relies upon inapposite. The Complaint here does not challenge agency discretion, and is therefore not subject to dismissal under any exception provided by Section 702.

To be clear, Gentile is not attempting to limit the SEC's broad discretion to conduct an investigation in any manner it sees fit, nor is Gentile suggesting the SEC is limited to investigating the individuals or entities specifically named or referred to in an FOI. Gentile is merely asserting his rights that the SEC acknowledges exist: that the SEC may not issue subpoenas under an FOI unless there is some reasonable relation between the documents and testimony requested in the subpoena and the authorized investigation.  Because the subpoenas issued under 15 U.S.C. § 78(u)(b) were not authorized under the law, agency discretion does not come into play.

**B.  No other limitations preclude judicial review under the APA**

The Commission asserts that a subpoena enforcement action pursuant to 15 U.S.C. § 78(u)(c) provides an "[e]xclusive mechanism to challenge an investigation," creating a limitation unaffected by the APA.  (SEC Br., p. 18).  This is simply wrong, as even *Sprecher* explains, albeit not with complete clarity.  As an initial matter, this provision is entirely silent and provides no guidance on the question of how the target of an unauthorized investigation can assert his rights. So any assertion that the statute facially precludes judicial review is legally unsupportable.  Moreover, courts have long been recognized to have the power to stop an agency from acting without authority, even in those circumstances where an agency takes pains to avoid any judicial test of its conduct, which is the exact scenario in this case.  The SEC has refused to file a subpoena enforcement action against Gentile, despite Gentile's request for over three years that the SEC do so, a tactic clearly designed to attempt to prohibit him from challenging their unauthorized investigation.  See *United States v. Morton Salt Co.,* 338 U.S. 632, 654 (1950)

("We are not prepared to say that courts would be powerless if [] an order [] still is considered to be so arbitrary as to be unlawful and the Government pursues a policy of accumulating penalties while avoiding a judicial test by refusing to bring action to recover them.").

Neither *Sprecher* nor *Arjent* or any other case create a limitation on judicial review under the APA.  In *Sprecher*, the Second Circuit indicated that Sprecher's claims were barred because he had already had the opportunity to make his allegations of harassment against the SEC in the prior subpoena enforcement action in which the SEC was supported by an FOI authorizing the investigation.  *Sprecher v. Graber*, 716 F.2d 968, 974 (2d Cir. 1983).  The facts here are entirely different since the Commission never authorized the investigation of Gentile and SureTrader or any potential violation of the securities laws they were remotely connected to, and the current investigation is entirely unrelated to any authorized investigation.

Compounding the issue, the SEC now claims to have been aware of Gentile and SureTrader violating the securities laws by soliciting U.S. customers since 2014, apparently during the entire time of his cooperation where he had dozens of discussions about SureTrader, its clients, its policies, and its customer base with the government, including SEC Staff.  Over the past five years, Gentile has vehemently denied that his or SureTrader's business practices constitutes solicitation – as a matter of law – and has asked the SEC repeatedly to file a subpoena enforcement action, or even a civil enforcement action, against him so that he could challenge the "investigation."  The SEC has refused to do so. For the SEC to now argue that Gentile cannot challenge the investigation because he can only do so in response to a subpoena enforcement action that it has refused to file against him is absurd.

*Arjent LLC v. SEC* is even less helpful for the Commission. In *Arjent*, the court held that sovereign immunity barred the plaintiffs' claims, the Southern District of New York based its decision on a finding that the defendant had previously raised identical arguments in the prior

subpoena enforcement action. *Arjent LLC v. SEC*, 7 F. Supp. 3d 378, 384 (S.D.N.Y. 2014)

("[b]ecause the issues of harassment and inappropriate agency action were raised in the subpoena

enforcement proceeding, and those issues were actually litigated [], it may not be said that

Arjent's current claim is 'wholly collateral' to it.").[14]

1.    The SEC's "first to file" argument does not apply to different cases involving different parties and is disingenuous because this Court's grant of jurisdiction to hear Gentile's Complaint did not arise until the SEC filed a subpoena enforcement action.

The SEC asks for this plenary action to be dismissed in favor of two summary

proceedings (subpoena enforcement actions) that are pending in the United States District Court

for the Southern District of Florida, citing the first-filed rule to argue that those related SEC

subpoena enforcement actions, which are pending against Marin and MinTrade Technologies

should take precedent because they are first-filed by a few days.  *SEC v. Marin*, Case No. 19-mc-

20593-UU, SDF; *SEC v. MinTrade Technologies*, Case No. 1:19-mc-20496-KMW.  But this

argument is simply not applicable here. The Third Circuit has held that two key elements of the

first-filed rule are that both the parties and the issues before different federal district courts are

the same. *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988), *aff'd*, 493 U.S.

182, 110 S. Ct. 577 (1990).  Since the parties in the Miami action and in the New Jersey action

are different (Gentile is not a party to either Miami action), and the issues are also dissimilar as

---

[14] Nor should the fact that Gentile has sought to intervene in *Marin* and *MinTrade* drive the analysis or suggest that Gentile will have the opportunity to protect his rights outside of this action against the SEC in the District of New Jersey.  Indeed, the SEC has refused to consent to Gentile's motion to intervene in both of those actions. But more to the point, those are summary proceedings which do not include the full rights to litigate the case, and Gentile should not be forced to individually intervene and defend against each SEC subpoena enforcement action pursuant to an FOI that provides no basis to investigate him.  Such a requirement would subject him to potentially endless litigation.  And to the extent most subpoenas that target him issued under the Traders Café FOI are complied with without his knowledge or judicial intervention, this Court should reach the merits of his claim regarding the investigation, not just an individual subpoena.

those "summary proceedings" involve very narrow issues applicable only to the subpoena

recipients (i.e., whether the court in the Marin subpoena enforcement action has personal

jurisdiction over Marin), the "first-filed case" analysis is undeniably irrelevant.

In any event, the first-filed rule is a particularly unfair argument here given that Gentile

could not bring this action against the SEC seeking to enjoin the SEC from its attempt to enforce

subpoenas and conduct this unauthorized investigation until the SEC sought to enforce a

subpoena in a federal district court.  While there are some exceptions, the weight of the law

suggests that courts cannot entertain pre-enforcement challenges to administrative subpoenas.

Given this analysis, Gentile believed he had to wait until the SEC tried to enforce a subpoena in

court before bringing his case for abuse of process against the SEC in the District of New Jersey.

See *Sec. & Exch. Comm'n v. Huff*, No. 08-60315-CIV, 2009 WL 10667890, at *4 (S.D. Fla.

2009).

## II.    Venue Is Proper in This Court Because the Commission's Wrongful Conduct Damaged Gentile Here

Under 28 U.S.C. § 1391, venue is proper in this district because a substantial part

of the events giving rise to the claim occurred here, and the Securities and Exchange

Commission is subject to personal jurisdiction in this district. Specifically, the Commission has

asserted to this Court that its investigation into Gentile under the Traders Café FOI is related to

the civil complaint the Commission filed against Gentile in this Court in March 2016 and the

Amended Complaint filed in October 2017, and the unauthorized investigation has caused

damage to Gentile in this district.  Gentile was forced to litigate in this district the question of

whether he or SureTrader engaged in any conduct that could be considered a violation of the

securities laws during 2012-2018. So while the unauthorized investigation may be based out of

Miami, venue is based here on where the Plaintiff was harmed.

The SEC's primary argument against venue in this Court is to point out "that the Exchange Act contains a specific venue provision for litigation concerning a witness's refusal to comply with SEC investigative subpoenas." (SEC Br. pg. 26). Maybe so, but this case does not involve a witness's refusal to comply with a subpoena. The SEC chose to bring a litigation in this Court arguing that Gentile's conduct past 2008 until 2018 suggested that he was likely to violate the securities laws because he was running a Bahamian broker-dealer, SureTrader, which he was expanding. This argument was premised on the unauthorized investigation out of Miami.[15] If the Court has subject matter jurisdiction over this case – which it does – then venue is proper too.

### III.    Gentile's Claim Entitles Him to the Relief He Seeks

The Commission argues that "Gentile cannot state an abuse of process claim based on a purported right not to be investigated or alleged harms resulting from an investigation." (SEC Br. pg. 27). But Gentile has never alleged he has a right not to be investigated by the SEC.  Rather, what Gentile argues is that if the SEC seeks to investigate him it must do so in accordance with the law.

The Commission also misrepresents to the Court that a "central theme of Gentile's Complaint about the Miami Investigation seems to be that he is being investigated despite not being specifically named in the Trader's Café FOI." But the Commission mischaracterizes Gentile's argument, which is that the Trader's Café FOI is entirely unrelated to him, and the subpoenas issued seeking information about him and his company have no reasonable relationship to the Trader's Café FOI. The Traders Café investigation from 2013 plainly has no reasonable relationship to Gentile or SureTrader, either at that time, or in 2016, or today.  To the

---

[15] Moreover, evidence that the parallel investigations into the same alleged conduct by Gentile was a joint endeavor by the Commission's office representatives in New Jersey and Miami are just beginning to surface, as Weissman testified at the March 19 trial that she did communicate with SEC staff from the New York Regional office about Gentile. (Ford Dec. ¶ 9, Ex. 6).

extent the Commission is seeking to argue that the Traders Café FOI can be used to investigate Gentile because they are investigating violations of the same provisions of the securities laws (Sections 5(a)-(c), 15(a)), this would clearly be an insufficient nexus.  If this were permitted, the Commission would only need to grant one FOI per statutory provision to investigate one and all. Obviously that is not the "reasonable relevance" Congress had in mind. Congressional intent was for a proper FOI for each reasonably relevant investigation authorized by the Commission, not one FOI to be recycled at the whim of the SEC staff.

Finally, the Commission presents yet another strawman argument that Gentile is attempting to argue that the investigation must stop because it is being done for an improper purpose.  But this misses the thrust of the argument.  Gentile *does* believe the SEC's motives here are primarily to harass him. What else could possibly explain the Commission stating publicly that it believes Gentile has been violating the securities laws by soliciting U.S. customers for five years, yet not take any steps to stop it? Either this is an admission that the SEC has utterly failed in its mission to protect investors as it is required to do, or it is an admission that the purpose of the investigation is just to harass Gentile. Regardless, Gentile is not arguing "improper investigative purpose," he is arguing that there is no authorized FOI, making the Commission's arguments on pages 29-30 irrelevant.

## IV.   Gentile Is Entitled to a Preliminary Injunction

### A.  Gentile is likely to succeed on the merits of his claim and can show irreparable harm

For the reasons stated above, Gentile is likely to succeed on the merits.  The SEC will be unable to prove that its current investigation into him and SureTrader have any "reasonable relevance" to the Traders Café FOI.  Consistent with the standard set forth in *Wheeling-Pittsburgh* for proving an unauthorized investigation, Gentile can prove that "the SEC knew that its process was being abused, that it knowingly did nothing to prevent this abuse, and, in

addition, that it vigorously pursued the frivolous charges [which] is, like a determination of bad faith, a separate reason for an ultimate conclusion that the court's process was being abused." *Sec. & Exch. Comm'n v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981).

Moreover, being the target of an unauthorized investigation, in violation of his rights to be free from unwarranted government interference, is *ipso facto* irreparable harm that cannot be remedied with money damages. An agency's abuse of judicial process is irreparable harm. The Complaint also sets forth the irreparable harm to his businesses and reputation, which the Commission dismisses by noting that Gentile can receive money damages from any company that stops doing business with him.  That assertion makes no sense since Gentile cannot seek money damages from banks caused by the Commission's wrongful acts and Gentile is not entitled to money damages from the Commission, as that claim *is actually barred by sovereign immunity*.  Therefore, Gentile will never be able to recover money damages from the harm being inflicted on him by this improper investigation, entitling him to the preliminary injunction.

### B.  The balance of the equities and public interest weighs in favor of granting Gentile's request for a preliminary injunction

The balance of equities weighs in Gentile's favor because there is no harm in the Commission being enjoined from continuing the investigation into Gentile during the pendency of this lawsuit.  Indeed, as the Associate Regional Director of the Miami Regional Office of the SEC recently testified, she has purportedly been aware that Gentile and SureTrader have been soliciting United States customers since 2014. Surely if the Commission believes that five years is an appropriate amount of time to "investigate" this knowing violation of the securities law, then another several months will not seriously impact the inquiry.  Gentile, however, will be severely harmed if the unauthorized investigation is permitted to continue during this litigation for the reasons argued above.  Moreover, with the proper justification, the Miami Commission Staff can quickly obtain an FOI from the Commission which would allow them to appropriately

investigate Gentile without any delay.  Accordingly, both the balancing of the equities and the public interest weigh heavily in Gentile's favor.

## CONCLUSION

For the foregoing reasons, Gentile respectfully requests that the Court grant his motion for a preliminary injunction, enjoining the Commission from taking any further investigative actions pursuant to an FOI that has no reasonable relevance to its Miami investigation of Gentile and SureTrader.

Dated: April 15, 2019

Respectfully submitted,

Ford O'Brien LLP
Adam C. Ford, Esq.
575 Fifth Avenue, 17th Floor
New York, NY 10017
Telephone No: (212) 858-0040
Email: aford@fordobrien.com

*Attorney for Plaintiff Guy Gentile*