# EXHIBIT 6

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                          CASE NO. 19-MC-20493-UU
 3
     SECURITIES AND EXCHANGE
 4   COMMISSION,

 5                                        Miami, Florida
                        Plaintiff(s),
 6                                        March 19, 2019
             vs.
 7
     CARLA MARIN,
 8
                    Defendant(s).      Pages 1 - 98
 9   ----------------------------------------------------------

10                            HEARING
               TRANSCRIBED FROM DIGITAL AUDIO RECORDING
11            BEFORE THE HONORABLE JOHN J. O'SULLIVAN
                   UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     FOR THE PLAINTIFF(S):  AMIE RIGGLE BERLIN, ESQ.
14                          U.S. SECURITIES AND EXCHANGE COMMISSION
                            801 Brickell Avenue
15                          Miami, FL 33131
                            (305) 982-6300
16                          berlina@sec.gov

17   FOR THE DEFENDANT(S):  LORNE E. BERKELEY, ESQ.
                            ALEXANDER L. WILDMAN, ESQ.
18                          DANIELS RODRIGUEZ BERKELEY
                            DANIELS & CRUZ, P.A.
19                          4000 Ponce De Leon Blvd.
                            (305) 448-7988
20                          lberkeley@drbdc-law.com
                            awildman@drbdc-law.com
21
     TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
22                          Court Reporter
                            jemancari@gmail.com
23

24

25
```

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                         Page
 3   JESSICA MARIA WEISSMAN
 4   Direct By Ms. Berlin . . . . . . . . . . . . .47
 5   Cross By Mr. Berkeley  . . . . . . . . . . . .61
 6   Redirect By Ms. Berlin . . . . . . . . . . . .92
 7                   GOVERNMENT EXHIBITS
 8   Exhibit No.                          Received
 9    1-5   . . . . . . . . . . . . . . . . . . .61
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   Thereupon,

2   the following proceedings were held:

3           THE COURT:  Good morning.  We are here today in the

4   case of the SEC v. Carla Marin, case No. 19 mc 20493.

5           Could I have appearances for the SEC first.

6           MS. BERLIN:  Good morning.  Amie Riggle Berlin on

7   behalf of the SEC, and with me is our paralegal Victoria

8   Jackman.

9           THE COURT:  OK.  Good.

10          MR. BERKELEY:  Good morning, your Honor.  Lorne

11  Berkeley on behalf of defendant -- respondent, actually, Carla

12  Marin.

13          MR. WILDMAN:  Alex Wildman on behalf of the

14  respondent.

15          THE COURT:  OK.  Good.

16          So I guess I will hear from the SEC first, although --

17  well, actually, I'd like to hear from the respondent first

18  because there's a few objections that you made that seem like

19  they shouldn't take much argument, like jurisdiction, venue.

20          Do you think the SEC can't serve a subpoena to someone

21  who is up in New York, and doesn't the statute specifically say

22  that they have jurisdiction or they can file their motion to

23  enforce in the district where the investigation is being

24  conducted?

25          MR. BERKELEY:  Your Honor, yes, that is our position.

1       THE COURT:  But I mean, you are citing Florida cases

2   on jurisdiction in a federal statutory case.  I can't believe

3   you're going to come in here -- well, let me hear your argument

4   because it will be astounding if there is any kind of way to

5   say that there's not jurisdiction or venue here.

6       MR. BERKELEY:  Sure, your Honor.  May it please the

7   court, just as a footnote, we did file a limited notice of

8   appearance on behalf of respondent Carla Marin solely to

9   contest the jurisdictional issue, which obviously your Honor

10  has raised.

11      Our response to that --

12      THE COURT:  I'm sorry.  You're only attacking

13  jurisdiction here or you're also attacking the legitimacy of

14  the subpoena?

15      MR. BERKELEY:  We did both, your Honor, because the

16  federal rules obviously allow making the argument of the

17  jurisdiction while still making alternative arguments without

18  waiving the jurisdictional argument.  But we wanted to

19  obviously make sure that on the record it was clear that it was

20  a limited-purpose appearance for jurisdiction so as not to

21  waive it.  But we did make alternative arguments, your Honor.

22      THE COURT:  OK.  All right.  Go ahead.

23      MR. BERKELEY:  Thank you, your Honor.

24      The jurisdictional issue here, your Honor, the SEC

25  would like to proceed under the Carrillo case.  Under the

1   Carrillo case, their argument is that they can have worldwide

2   service of process anywhere within the United States of

3   America.

4           Now, just real briefly, if your Honor would bear with

5   me a moment, to understand how we got here, because the

6   question today is, is there personal jurisdiction over

7   Ms. Marin.

8           THE COURT:  Right.

9           MR. BERKELEY:  In order to understand that question we

10  have to understand how we got here.

11          How we got here was through a formal order of

12  investigation issued by the SEC in 2013.  That formal order of

13  investigation was to investigate Traders Cafe.  Traders Cafe's

14  owners, members, solely were two individuals -- Scipione and

15  Ionno.  Not Ms. Marin, not Guy Gentile, the true target of this

16  action.

17          Those individuals pled out, resolved their matter with

18  the SEC several years ago.  Again, it was for events involving

19  a 2013 FOI for events in 2012.

20          The Traders Cafe investigation is over, in essence,

21  based upon the resolution with Scipione and Ionno.

22          The SEC is now trying to pursue their vendetta, what I

23  will call it, against Guy Gentile by using this stale 2013 FOI

24  to issue the instant subpoena against Carla Marin, an

25  individual, Guy Gentile's attorney.

1          Their basis for doing so is that Traders Cafe had an

2     account with SureTrader, Guy Gentile's Bahamian company.

3     SureTrader at some point in time transferred funds to Mint

4     Custody, a Delaware corporation that Ms. Marin was an officer

5     of.  That's the documents that they're seeking.

6          THE COURT:  She was an officer and an owner.

7          MR. BERKELEY:  Officer and an owner of a Delaware

8     corporation, that is correct, your Honor.

9          As you can see, there's no Florida connection.

10         THE COURT:  I want to get to my question first.

11         MR. BERKELEY:  Sure.

12         THE COURT:  Which is, under II, you say:  The

13    application should be denied because it fails to allege a basis

14    for the court to exercise personal jurisdiction over the

15    respondent Marin, and then the conclusion is the complaint did

16    not allege a basis for jurisdiction under Florida statute

17    48.193.

18         I mean, I don't understand why that section is in

19    there.  Can we just get rid of that now or are you going to

20    argue that they have to establish jurisdiction under a Florida

21    statute when they are bringing a case pursuant to a federal

22    statute?

23         MR. BERKELEY:  Your Honor, your Honor is correct.

24    Obviously this is a federal case going under 15, U.S.C., 78-u,

25    a federal statute.

1          THE COURT:  OK.  So answer my question.  Are you

2   abandoning your argument that they have to meet jurisdiction

3   under the Florida statute?  Yes or no.  Just tell me that.

4          I'm not saying you can't argue this other stuff, that

5   this thing is bad, it is stale, it's terrible, it's dead, or

6   whatever it is.

7          MR. BERKELEY:  Under Florida statute, yes, your Honor.

8          THE COURT:  OK.  So Florida statute you agree does not

9   apply in this case.

10          MR. BERKELEY:  Yes, Florida statute does not apply.

11   We are obviously dealing with the federal statutes, and I can

12   address that issue right now.

13          THE COURT:  Obviously.

14          Did you write this?

15          MR. BERKELEY:  I did write it, along with my

16   associate.

17          THE COURT:  You say obvious.  In the conclusion you

18   say:  In sum, the complaint does not allege a basis for

19   jurisdiction under Florida statute 48.193.  So I mean, that's

20   not -- obviously, if you think it is obvious.  Why is it in

21   your pleading?

22          MR. BERKELEY:  I think that it does apply in part,

23   your Honor, from the standpoint of, as your Honor is aware,

24   federal courts obviously do look to Florida statute to provide

25   guidance, and in this particular instance I think that was

1    really the point of it.

2          I can address the federal aspect of this as well, your

3    Honor, to answer your Honor's question directly.

4          THE COURT:  All right.

5          MR. BERKELEY:  Under 15, U.S.C., 78-u, which is what

6    the SEC is traveling under, they state that they have worldwide

7    service of process under that statute, and because that statute

8    allows for worldwide service of process, they can establish

9    personal jurisdiction anywhere in the United States.

10          Now, that's the exception to the rule.  The rule being

11   that one must establish minimum contacts with the state, and

12   they use the Carrillo case.  If I can just explain the

13   difference.

14          The Carrillo case and the rule that the SEC is flying

15   under under federal statute to establish personal jurisdiction

16   anywhere in the United States pertains to an alien defendant.

17   That's the difference.

18          Carrillo was dealing with an alien defendant, someone

19   that did not have a home state, was a Costa Rican individual

20   that was conducting business within the State of Florida.  So

21   the court in Carrillo said, wait a second, we have to establish

22   a new rule here because we have never been confronted with an

23   alien defendant, because typically, as we all know from first

24   year of law school, International Shoe, you're going to have to

25   establish in order to meet personal jurisdiction that the

1    complaint alleges sufficient jurisdictional facts to bring the

2    action within the long arm statute and that you must analyze

3    minimum contacts to satisfy due process.

4         That is the rule.  That is what should be applied to

5    Ms. Marin.  Not an alien defendant analysis where there is no

6    forum state for the individual.  And if you look at Carrillo --

7         THE COURT:  Just so I understand, are you contending

8    that the SEC here in Florida, on a Florida investigation,

9    cannot -- do they have the ability to subpoena somebody who is

10   outside of the state?

11        MR. BERKELEY:  They can issue subpoenas related to

12   their Florida investigation outside the state, that is correct.

13        THE COURT:  And then when they have to enforce it,

14   it's your contention that they have to go to where the person

15   is a resident or where they have sufficient contacts?

16        MR. BERKELEY:  Yes.  That is correct, your Honor.

17        Under the SEC's theory, in essence, they can conduct

18   an investigation anywhere they want in the U.S. and they can

19   haul a United States citizen anywhere in this entire country.

20   That offends the notion of due process, the Fourteenth

21   Amendment, and the Carrillo case cites to Knowles.

22        The Knowles case deals with a United States citizen.

23   It says that you must go through the minimum contacts analysis,

24   that being sufficient minimum contacts with the jurisdiction.

25   The exercise of jurisdiction must not offend traditional

1    notions of fair play and substantial justice and, furthermore,

2    the parties' activities within the jurisdiction must be

3    reasonably foreseeable that that person will find themselves in

4    that jurisdiction.

5           The Knowles case is this exact case in the sense of

6    it's an enforcement of an SEC application to enforce a

7    subpoena, and the court in Knowles --

8           THE COURT:  Where is that in your papers?

9           MR. WILDMAN:  Your Honor, it's actually cited in

10   footnote 4 of the Carrillo case which they cited in their

11   reply.

12          THE COURT:  Nowhere did you cite this argument.  You

13   didn't cite to me any SEC case that said anywhere that they had

14   to have minimum contacts.  Instead you cited me Florida cases

15   which say you have to have minimum contacts on Florida cases.

16          MR. BERKELEY:  Well, it was -- your Honor, I probably

17   could have done a better job making it more of a direct

18   argument, but it was part of -- we got the reply to our

19   response from the SEC, and of course we can't write another

20   paper to their reply, so that is what drove this argument more

21   to the forefront, was the SEC's reply to our response which was

22   when the SEC was quoting an alien defendant analysis as to be

23   applied to a U.S. citizen.

24          THE COURT:  OK.  All right.  What is the cite of

25   Knowles?

1          MR. BERKELEY:  The cite of Knowles, your Honor, is 87

2  F.3d 413.

3          THE COURT:  OK.

4          MR. BERKELEY:  June 20, 1996.

5          THE COURT:  What circuit is that?

6          MR. BERKELEY:  The Tenth Circuit, your Honor, United

7  States Court of Appeals.

8          THE COURT:  All right.  Go ahead.

9          MR. BERKELEY:  In short, your Honor, in addressing the

10  personal jurisdiction issue, I do believe that the fundamental

11  difference between the SEC's position of applying the analysis

12  of service of process, which is obviously different than

13  personal jurisdiction -- 15, U.S.C., 78-u is service of

14  process -- different than jurisdiction -- worldwide that allows

15  personal jurisdiction to be established based upon an alien

16  defendant.  Not to sound repetitive, but I think that's the

17  distinguishment.

18          I think here we're dealing with a New York resident.

19  In our response, your Honor --

20          THE COURT:  But doesn't the statute itself say that a

21  refusal to obey a subpoena issued to any person by the

22  Commission, the Commission may invoke the aid of any court of

23  the United States within which the jurisdiction of which such

24  investigation or proceeding is carried on?

25          MR. BERKELEY:  Right.

1          THE COURT:  And then:  Or where the person resides or

2   carries on their business.

3          MR. BERKELEY:  Your Honor, I --

4          THE COURT:  Doesn't that give two choices there under

5   the statute?

6          MR. BERKELEY:  Well, I would think that under 15,

7   U.S.C., 78-u, it says:  All process in any such case may be

8   served in the judicial district where such person is an

9   inhabitant or wherever he may be found.

10         So I would argue to your Honor that Ms. Marin is an

11  inhabitant of the State of New York and was not found in the

12  State of Florida, was not served, service of process in the

13  State of Florida, but, rather, New York.

14         We are here for an order to show cause hearing,

15  evidentiary hearing.  In our response we submitted a sworn

16  affidavit, that's uncontroverted from Ms. Marin, that states

17  she is --

18         THE COURT:  Well, I understand.  The statute that you

19  are citing is where they can serve a subpoena, which basically

20  is anywhere the person is found, essentially, in the United

21  States.  The other statute, the 78-u(c), talks about what

22  happens when someone doesn't obey a subpoena, and that's where

23  does the SEC bring their motion to enforce a subpoena.  And it

24  says:  Either where the investigation or proceeding is carried

25  on or where the person resides or carries on their business.

1      So doesn't that give the SEC the option of either --

2      they certainly could go to New Jersey because you are carrying

3      on business there or your client is.  It is New Jersey, right,

4      that she is --

5           MR. BERKELEY:  Yes.

6           THE COURT:  Or Florida where the investigation is

7      located.

8           MR. BERKELEY:  Your Honor, my response to that would

9      be that at the end of the day the rule says what it says,

10     obviously.

11          THE COURT:  The statute you mean.

12          MR. BERKELEY:  The statute.  I apologize.  However,

13     the court does interpret the statute and the court rulings that

14     we are dealing with here do interpret the statute under the

15     minimum contacts analysis.

16          Again, in the Knowles case it deals with the

17     enforcement of an SEC application.  It deals with the personal

18     jurisdiction issue that was contested just as we're contesting

19     it here, and the Knowles court went through that minimum

20     contacts analysis.

21          THE COURT:  Were the facts similar to this?

22          MR. BERKELEY:  Yes.

23          THE COURT:  I mean somebody who lives in some faraway

24     state who was dragged into another state to respond.

25          MR. BERKELEY:  Yes, your Honor.

1      I would also point out in the Carrillo case, Carrillo

2  does also go through the minimum contact analysis, but they

3  obviously go through it under jurisdiction in the entire United

4  States because he was a foreign or an alien defendant.

5      So I do understand your Honor's point in regard to the

6  code, the statute, but they are interpreted through the courts,

7  as your Honor is aware, and I would submit to your Honor,

8  respectfully --

9      THE COURT:  I'm not aware, actually, until you just

10  made me aware of the Knowles case.

11      MR. BERKELEY:  Thank you, your Honor.  I apologize.

12      THE COURT:  All right.  I mean, I don't do these very

13  often.  So it is not like I do these once a week and I'm aware

14  of all the law on this.  What I am aware of is what I read in

15  your papers.

16      MR. BERKELEY:  I understand, your Honor.

17      THE COURT:  OK.  Go ahead.  What are your other

18  arguments?

19      MR. BERKELEY:  Your Honor, would you allow Mr. Wildman

20  to address the other arguments?

21      THE COURT:  Yes.  Sure.

22      MR. WILDMAN:  Good morning, your Honor.  Now obviously

23  Mr. Berkeley has laid out in detail our position relative to

24  jurisdiction.  I don't think we need to belabor that point.

25      As far as setting aside that issue, which I think is

1    sort of the initial hurdle this court will need to go past,

2    beyond that our position is also essentially that obviously

3    this subpoena -- I mean the FOI in question for Traders Cafe,

4    our position of course is it is stale.  Beyond that, though, it

5    is really the lack of linkage as between this FOI as to Traders

6    Cafe and Ms. Marin.  I mean, there is a vague sort of

7    connection that's laid out, but as we lay out in our response,

8    to the extent their interest is really to seek records and

9    information relative to Mint Custody, which is as they lay out

10   in their application what they claim, they haven't sought the

11   30(b)(6) representative or record custodian of Mint Custody,

12   which in our view belies the whole legitimacy of this

13   application and why we've sort of asserted in our response that

14   this really relates back to Mr. Gentile, which dovetails to our

15   position in our response is, why would they not just bring this

16   back up to New Jersey where they have been litigating with

17   Mr. Gentile for the better part of three years.

18           THE COURT:  They say it is a separate scheme, that he

19   is in some penny stock scheme up there and here it was selling

20   securities through, that were being sold in the Bahamas, I

21   think, that weren't properly -- to U.S. citizens that should

22   have been registered or had some kind of SEC jurisdiction over.

23           MR. WILDMAN:  Yes, your Honor.  I think they have

24   tried to draw this sort of -- I think the problem with their

25   argument in their view is simple.  At the end of the day the

 1   only way for them to establish a link between my client and

 2   this FOI is by invoking Mr. Gentile and SureTrader.  There is

 3   no way around that.  That's what they lay out in their

 4   application.

 5          So on the one hand they want to run towards

 6   Mr. Gentile so as to justify the even relevance of my client to

 7   this FOI, but on the other hand want to take the position that

 8   they are totally unrelated, that's a penny stock fraud scheme

 9   and this is just an administrative application.  They make

10   great efforts to differentiate the two, but it is an apples and

11   oranges comparison.  This is an administrative application as

12   compared to a lawsuit.  Of course they are not going to be the

13   identical parties because there are no parties other than the

14   SEC here and Ms. Marin.  But I think they actually --

15          THE COURT:  Well, Ms. Marin is not identical.  She is

16   not a party in the other lawsuit.

17          I guess what I don't understand is they say that

18   Gentile is subject to a penny stock fraud in New Jersey.

19          MR. WILDMAN:  Right.

20          THE COURT:  Gentile, according to them, was all over

21   the place committing frauds.  One of them he committed in New

22   Jersey and the SEC up there is going after him.  Another one

23   they allege he committed, or I don't know about him, but

24   SureTrader was involved with the movement of funds between

25   SureTrader and -- what's the name of the company -- Mint.

1      MR. BERKELEY:  Mint Custody, your Honor.

2      THE COURT:  And that those funds related to securities

3 that were not properly registered in the United States, I

4 guess, or they were sold to U.S. citizens and they had to meet

5 certain regulations.

6      MR. BERKELEY:  Right.

7      THE COURT:  I mean, how are those two related?  That

8 would be like if somebody robs a bank in New Jersey and then

9 comes down here and robs a 7-Eleven.  They are not, other than

10 they are the same person, and the United States is the

11 plaintiff in both cases, they are not related.  They are two

12 different frauds, two different crimes.

13      MR. WILDMAN:  Your Honor, I think they actually say to

14 you in their reply that they are related.  This is from page 9

15 of their reply.  This is where they are telling you, the court,

16 why this application is relevant and needs to be followed

17 through on.

18      They say:  As set forth in the application, this

19 information, i.e., what they're seeking in the subpoena, is

20 highly relevant --

21      THE COURT:  Where are you reading?

22      MR. WILDMAN:  I'm at page 9 of their reply, your

23 Honor.

24      THE COURT:  But where?

25      MR. WILDMAN:  It's the second paragraph.  The first

```
 1    full paragraph at the top on page 9.

 2              THE COURT:  "As set forth."

 3         MR. WILDMAN:  If you look at "as set forth," they say:

 4    This information is highly relevant to the SEC's investigation

 5    to whether Gentile, SureTrader and others have violated federal

 6    securities law by engaging in unregistered broker-dealer

 7    conduct in the United States.

 8              THE COURT:  Right.

 9         MR. WILDMAN:  At the end of the day they are already

10    litigating that in New Jersey.

11              THE COURT:  How are they litigating -- that is what I

12    don't understand.  They are not trying to pretend this doesn't

13    relate to Gentile.  They're saying it relates to Gentile and

14    SureTrader for unregistered broker-dealer conduct, not for

15    blowing up penny stocks or inflating the value of penny stocks.

16         MR. WILDMAN:  In our view, your Honor, what they're

17    essentially trying to do is engage in Florida what they can't

18    do in New York.  I'm sorry.  New Jersey, insofar as their case

19    was dismissed in New Jersey against Mr. Gentile.  They have

20    appealed that.  Conceptually, the jurisdiction as to all

21    matters related to their investigation into Gentile are pending

22    on appeal in New Jersey.  So they're going to go down to

23    Florida and engage in discovery.

24              THE COURT:  OK.  Well, what case do you have that says

25    that the SEC if they investigate somebody has to do it all out
```

1    of one office at one time?  I mean, I just don't see that.  I

2    don't understand.  I mean, if you could show me, hey, they are

3    not really investigating this broker stuff, they're

4    investigating the penny stock fraud down here, then I would be

5    inclined to agree with you that, hey, you can't investigate him

6    up there for penny stocks, get your case dismissed, and then

7    come down here -- I mean, they can investigate him for penny

8    stocks down here, but not for the same actions that were

9    dismissed in New Jersey, I don't think.

10          MR. BERKELEY:  Your Honor, if I may respond to that

11   question?

12          THE COURT:  Yes.

13          MR. BERKELEY:  Up in New Jersey Judge Linares has been

14   the judge presiding over these matters involving Mr. Gentile

15   and the SEC.

16          THE COURT:  Right.

17          MR. BERKELEY:  The SEC has brought several different

18   matters against Mr. Gentile.  Again, as Mr. Wildman pointed

19   out, one was dismissed, and now it is on appeal.  Judge Linares

20   said if you are going to bring a new action, bring all the

21   causes of action that you possibly know about against

22   Mr. Gentile.  That's in an opinion issued by Judge Linares up

23   in New Jersey.  Because it was his intent to hear all of the

24   issues related to Mr. Gentile because the SEC kept firing, you

25   know, different issues at him.

1          Because of that Judge Linares opinion, I would

2    respectfully submit to your Honor that the SEC knew about this

3    action back in 2016 when they initiated legal proceedings,

4    prior to 2016 when there was a separate legal proceeding and a

5    separate 2011 FOI against, directed towards an investigation

6    involving Mr. Gentile.  And if they would have followed Judge

7    Linares' opinion, this matter should be and will be up there

8    depending on what happens with the appeal.

9          Basically up there they can't conduct discovery right

10   now because of the pending appeal.  So they are looking to get

11   around the Linares opinion, get around the discovery up in New

12   Jersey that cannot be conducted, and basically forum shop or

13   loop-end it around here in the State of Florida.

14         The SEC's claim to try and say, well, that's a

15   separate penny stock issue, no, it's not.  They are talking

16   about to the initial prosecution of Mr. Gentile back in 2008,

17   2010.  The SEC's case in 2016, which is cited in our papers,

18   deals with the issue of preventing Mr. Gentile from conducting

19   any further business as a broker-trader because of SEC

20   violations.  The exact statement that they put in their own

21   pleading.  So that 2016 case that is before Judge Linares right

22   now involves this very issue as admitted by the SEC.

23         THE COURT:  Involves what, that they want him to

24   stop -- in other words, the relief they are asking him for up

25   there is not allow him to be a broker-dealer.

1          MR. BERKELEY:  That is correct, your Honor.

2          THE COURT:  That is, again, like having a bank robbery

3     in two places and saying don't rob banks in New York and don't

4     rob banks in New Jersey, or in Florida.

5          Just because they are asking for it up there -- the

6     guy's doing a penny stock fraud.  They go to the court and say

7     order him that he's not allowed to be a broker-dealer anymore

8     because he's done these bad things in New Jersey.  Down here, I

9     mean, they haven't gotten very far yet, but apparently or

10    perhaps what they want is eventually to charge Mr. Gentile down

11    here for selling what he contended were Bahamian securities

12    that he was required to register in the United States and to

13    again tell him you can't be a broker-dealer in the United

14    States.  One reason is he can't be a broker-dealer because he

15    dealt in penny stocks in New Jersey and another is he can't be

16    a broker-dealer because he dealt in unregistered securities in

17    Florida.

18         MR. BERKELEY:  Well, I would respond to that as

19    follows.  The penny stock issue is sort of a red herring

20    created by the SEC, in my opinion, because the penny stock

21    issue is an issue that relates to the initial prosecution of

22    Mr. Gentile, which was dismissed, by the way.

23         The second proceeding by the SEC in their 2016 case

24    pending before Judge Linares does involve that exact issue of

25    him being potentially, because they haven't even completed

1    their investigation, being a broker-dealer selling -- being an

2    unregistered broker-dealer soliciting securities from United

3    States being a Bahamian broker-dealer.  That is the issue.

4              THE COURT:  That issue is in New Jersey?

5              MR. BERKELEY:  That issue is in New Jersey to stop him

6    from doing business, yes.

7              THE COURT:  OK.

8              What does the government say?

9              MS. BERLIN:  Shall I address each of his arguments or

10   just the latter?

11             THE COURT:  Yes.  Start with the personal

12   jurisdiction, I guess.

13             MS. BERLIN:  Yes.

14             THE COURT:  They say under the Knowles case that you

15   have to do a minimum contact analysis.

16             MS. BERLIN:  Let's talk about the Knowles case.  I

17   looked it up when they raised it, and I did recall seeing that

18   in my research.

19             The Knowles case, your Honor, involves a situation

20   involving a foreign national.  If memory serves, he is a

21   Bahamian individual.  The inquiry in that case was whether he

22   had minimum contacts with the United States for purposes of

23   having personal jurisdiction under the statute.  So the Knowles

24   case is not as --

25             THE COURT:  That's what they say the Carrillo case

1   was.

2          MS. BERLIN:  The Carrillo case -- contrary to what was

3   represented, the Knowles case is not about a minimum contact

4   situation with an individual and a specific state.  It has to

5   do with the United States.  So does the Carrillo case.  The

6   reason for that is because it is well-established that where

7   personal jurisdiction and service are based on a federal

8   statute where service can happen nationwide or worldwide, the

9   inquiry for personal jurisdiction is whether the individual

10  served has minimum contacts with the United States.  Then we

11  know that Ms. Marin did because we have her declaration

12  attached to --

13         THE COURT:  I mean, there is no doubt she is a U.S.

14  citizen.  She is practicing law.  Right?

15         MS. BERLIN:  Yes.  In New York.  By the way, she has

16  not indicated any connection to New Jersey.  Not that it

17  matters in any way whatsoever because it is very clear under

18  the statute that the SEC can bring our case where our

19  investigation is being conducted.

20         THE COURT:  So are there any cases that say that?

21         MS. BERLIN:  That the SEC can bring its case where it

22  is being conducted?

23         THE COURT:  Can enforce their subpoena without -- can

24  bring somebody to a jurisdiction to enforce a subpoena who has

25  no ties -- when I say ties, I mean the minimum ties as

1    required.  For instance, jurisdiction under the State of

2    Florida.

3              MS. BERLIN:  Well, we have, what I presented in our

4    brief was the SEC v. Carrillo case, which is an Eleventh

5    Circuit decision.

6              THE COURT:  But that is different.  That deals with an

7    alien they say and so does Knowles.  No court has ever written

8    on, hey, you can bring somebody from New York down to Florida,

9    from New Jersey to California or whatever it is.

10             MS. BERLIN:  Venue.  That would be sort of a venue

11   issue because the personal jurisdiction is established in the

12   federal statute which states where we can bring the case, and

13   it states we can bring the case where the Commission is

14   conducting its investigation or where the individual resides.

15             THE COURT:  I am going to ask you again.

16             MS. BERLIN:  So no --

17             THE COURT:  They agree because they can't disagree

18   that there is a statute that says that.

19             MS. BERLIN:  Yes.

20             THE COURT:  They are saying even though there is a

21   statute, you still have to establish minimum contacts.  That is

22   what they are indicating.

23             What I am asking, has that ever been addressed by a

24   district court or circuit court where somebody made a similar

25   argument and said you can't bring -- the SEC has to go -- in

1    other words, like under Rule 45 you have to go or at least you

2    used to have to go up to where the subpoena was served or

3    within 100 miles of the person to enforce the subpoena because

4    the people that created those rules decided it's not fair to

5    make someone from New Jersey come to Florida --

6            MS. BERLIN:  Right.

7            THE COURT:  -- when they are a witness in a case.

8            MS. BERLIN:  OK.  So under their theory I guess we

9    should be conducting her testimony in New York, which is where

10   she resides and works.

11           THE COURT:  Or you should be in New York or maybe New

12   Jersey, I don't know, New York to -- I don't know what her

13   contacts are in New Jersey, but --

14           MS. BERLIN:  Zero.

15           THE COURT:  -- to New York to enforce the subpoena,

16   that you should have brought this action in New York.

17           MS. BERLIN:  Right.  So we have the federal statute

18   and the Carrillo case, which I would encourage you to read

19   because the Carrillo case does not limit the analysis to the

20   fact that the person is an alien.  Instead, if you review that

21   case, what it does is it states -- the Eleventh Circuit hasn't

22   had this issue before, where we have to decide whether someone

23   needs to have minimum contacts in order to be holden to a court

24   here.  They are looking at an alien.  Here the respondent is an

25   alien.  And so they are looking at the United States.  They are

1   not looking to a specific state because that is not what the

2   statute requires.

3          The Carrillo case states, here's what other circuits

4   do.  There's a split.  We've never decided it.  We are going to

5   agree with all the circuits that find that minimum contact with

6   the United States is sufficient because that is the end of a

7   minimum contacts test where service is based on national

8   subpoena power, which is what we have here.

9          There is no distinction under the law, and I would

10  challenge them to find a case that says, oh, if the respondent

11  lives in the Bahamas, we apply a different analysis of a

12  federal statute.  That is not the case.

13         The basis, if you look at Carrillo, it is not

14  identifying this is different because this individual happens

15  to live in the Bahamas.  To the contrary, the court is looking

16  at what do we look at, whereas here the personal jurisdiction

17  issue is being raised based on a federal statute that gives the

18  SEC national or international subpoena power.  Obviously in

19  Carrillo they don't then go in and look further to say does he

20  have minimum contacts with the state.  No.

21         THE COURT:  Just so I understand there is no case,

22  though, that addresses with a U.S. citizen or citizen of a

23  state.

24         MS. BERLIN:  There very well could be.  This is

25  settled by federal statute and Eleventh Circuit.  I am sure

1    that I can find in a district court if someone else has ever

2    made this sort of argument that the federal statute doesn't

3    apply, that we could find you a case that addresses that venue

4    issue.

5              THE COURT:  OK.  Go ahead.  What is the next issue?

6              MS. BERLIN:  So the next point is that -- and the

7    Knowles case, again, is completely distinguishable.  It

8    involves, just like the Carrillo case, an alien respondent, the

9    same situation.

10             THE COURT:  OK.  I don't need to hear anymore about

11   that.

12             MS. BERLIN:  Right.  The next issue is the

13   representations being made about the SEC's investigation and

14   then the arguments springing from that that there's something

15   flawed about the investigation or that it doesn't involve

16   Ms. Marin.

17             The details of an SEC investigation are wholly

18   non-public.  They have not been made privy to any detail about

19   this case.  We have never discussed this investigation with

20   them nor would we.  So the representations they make about who

21   a target is, which we do not have targets at the SEC, or what

22   exactly we are investigating are wholly unfounded.

23             The SEC is prepared to make an in camera

24   representation to the court today if you would like to know

25   more about the investigation or the connection to Ms. Marin,

1    but we would ask you to disregard what the respondent tells you

2    about what the SEC is investigating and therefore to disregard

3    the arguments that spring from that.

4         THE COURT:  You have told me in your papers that you

5    are investigating the sale of Bahamian-registered securities in

6    the United States, aren't you?

7         MS. BERLIN:  Under our application we stated that is

8    one thing.  We are looking at unregistered broker-dealer

9    conduct based on a Bahamian broker-dealer firm and its contacts

10   with the United States.

11        Representations were made about it was Mr. Gentile and

12   his company and they are the exclusive targets.  If you look at

13   our application, you will see that it includes others as well.

14   It is Mr. Gentile, his Bahamian entity and others are being

15   investigated by the SEC in connection with a potential ongoing,

16   as we speak, as we stand here today, violation of the federal

17   securities laws by soliciting people in the United States to

18   participate and do business with an unregistered foreign

19   broker-dealer.  But the connection and who else it includes and

20   any connection to Ms. Marin and her company and the evidence

21   that has led us there are things that are non-public, but I am

22   prepared to present that to your Honor in camera if you would

23   like to have a further understanding.

24        Their next argument is that Ms. Gentile does not have

25   a connection to the formal order of investigation because she

1   is not mentioned in a formal order --

2            THE COURT:  You're talking about Ms. Marin, right?

3            MS. BERLIN:  I'm sorry.  Ms. Marin is not mentioned in

4   the formal order of investigation and therefore we cannot seek

5   testimony or documents from her.  They, as with most of their

6   arguments, provide no case law or legal support because this is

7   not the law.

8            A formal order is a very general statement.  It opens

9   an investigation and it authorizes the SEC to conduct one.  The

10  staff then has broad discretion on who to seek documents from

11  and who to seek testimony from, and it develops as an

12  investigation develops.  A formal order doesn't list every

13  potential witness, every potential person, and there is no

14  requirement that it do so, and common sense would indicate that

15  that is not the requirement.

16           As for the representation that our investigation

17  closed in whatever year they claim, 2013 or '14 when two

18  individuals were indicted by the criminal authorities, that is

19  not true.  We have stated repeatedly our investigation is

20  ongoing and continues to this day.

21           With respect to the argument that the SEC should

22  instead be pursuing a 30(b)(6) deposition or testimony or

23  something else, that is not for the respondent to dictate.  The

24  SEC can determine how to investigate its cases.  Here, we are

25  interested in Carla Marin personally based on the information

1    that we have gained, and that is who we are seeking evidence

2    from and there is a reason for it.  As stated in our

3    application, she has information that we believe is critical to

4    us continuing the investigation.

5         THE COURT:  What about their statement that the judge

6    up in New Jersey ordered you to bring all issues about Gentile

7    in New York?  I mean in New Jersey.

8         MS. BERLIN:  I would like to see that order.

9         THE COURT:  Do you have it there?

10        MR. BERKELEY:  Your Honor, yes, I can provide that,

11   along with a letter from the SEC to the Linares court, and I

12   will provide that to counsel.  That says:  "Gentile continues

13   to make his living in the securities industry operating an

14   online Bahamian broker-dealer SureTrader and retaining his

15   affiliation with the U.S. broker-dealer Stock USA Investments."

16        That's the exact issue that the SEC on their own

17   letterhead is stating in the Linares case right now going on,

18   SEC v. Gentile.

19        THE COURT:  I don't understand.  That is a letter to

20   who?

21        MR. BERKELEY:  That is a letter from the SEC to the

22   Honorable Joseph A. Dickson, a United States magistrate judge

23   in the District of New Jersey, where they are representing that

24   their own investigation on their own letterhead in New Jersey

25   and it is the same statement that they put in their Florida

1   pleading down here.  So they are absolutely inextricably

2   intertwined with each other.  That is why it should be stayed.

3   But I will provide the order and I will provide the SEC a copy

4   of their own letter.

5            THE COURT:  Which case is that in?

6            MR. BERKELEY:  That is in SEC v. Gentile, 16 Civ. 1619

7   (JLL).

8            THE COURT:  And is that different than the case that

9   is on appeal?

10           MR. BERKELEY:  No, that is the case that is on appeal.

11           THE COURT:  That is the case that is on appeal.

12           MR. BERKELEY:  That is the case that is on appeal

13   right now.

14           THE COURT:  Can you give that to the government,

15   please.

16           MR. BERKELEY:  Sure.

17           MS. BERLIN:  So I have been handed a letter dated

18   April 26, 2017 in a case that is closed that is completely

19   unrelated to the investigation we are here on today.

20           THE COURT:  Well, I mean, that is what you say.  But

21   it says in that letter, at least according to opposing counsel,

22   that the investigation relates to the sale of Bahamian

23   securities, unregistered Bahamian securities.

24           MS. BERLIN:  I'm sorry.  I'm looking at a letter where

25   an attorney for the SEC in New York includes one statement

1   discussing the fact that by his own admission Gentile continues

2   to make a living in the securities industry, operating an

3   online Bahamian broker-dealer.

4           THE COURT:  Right.

5           MS. BERLIN:  So I'm wholly unclear as to why her

6   representation about what he testified to in that case -- what

7   are you doing today?  Oh, I work for SureTrader -- how would

8   that possibly bring an investigation concerning unregistered

9   broker-dealer conduct within the scope of this New Jersey

10  complaint which alleges absolutely zero about foreign

11  broker-dealer and registration violations which has absolutely

12  zero allegation about SureTrader.

13          THE COURT:  Can I see the letter, please?

14          MS. BERLIN:  Yes.

15          May I approach?

16          THE COURT:  Yes, please.  Thanks.  Thank you.

17          What do you say about that?  What this letter says --

18  they're talking the prejudice to the Commission from a stay in

19  that they wanted an injunction against future violations of the

20  antifraud provisions of the federal securities laws and they

21  are telling the court by his own admission Gentile is still

22  involved in the securities business, basically.

23          MR. BERKELEY:  Your Honor, if I may.  I think the

24  point is that by their own admission they are telling the court

25  up there that this is something they are looking into, and that

1    is dated back in 2017.

2            THE COURT:  Where are they saying they are looking

3    into it?

4            MR. BERKELEY:  Well, I mean they are representing to

5    the court that this is something he's doing and now they're

6    suggesting that this is a wholly new activity that is unrelated

7    to the penny stock fraud investigation up in New York, but then

8    they are referencing ostensibly the identical statements that

9    they are making in their pleadings here.

10           THE COURT:  I mean, that's like saying, well, I want

11   an injunction to stop him from robbing banks in New York and

12   say, by the way, we heard that he is in a bank in Florida right

13   now.  I mean, I just don't understand.

14           MR. BERKELEY:  Your Honor --

15           THE COURT:  This doesn't say we are investigating him

16   in this case.  It doesn't even say that he is committing a

17   crime or a fraud here.  It just says we don't think he

18   should -- we think there should be an injunction preventing him

19   from being a broker and he is continuing to be a broker.

20           MR. BERKELEY:  Well, your Honor, the SEC in a May 9th

21   letter in that same case states:  As Mr. Gentile's counsel is

22   aware, the investigation into his operation of a Bahamian

23   broker-dealer has been ongoing since before the indictment was

24   filed.

25           This is that investigation.  This is in the same case

1    that the --

2           THE COURT:  Why are these letters in your motion?  I

3    mean in your response.  Is this the way you do things in New

4    York, you file a bunch of stuff and then you come down here and

5    start bringing out letters one by one as we go along?

6           MR. BERKELEY:  Absolutely not, your Honor.

7           THE COURT:  These letters have been around since 2017.

8           MR. BERKELEY:  You are correct.

9           Unfortunately, the SEC's response to our reply is what

10   prompted a lot of this further investigation and, admittedly,

11   the case is fairly new and I apologize for that.  But it is the

12   SEC's own letters.  They are obviously aware of their own

13   letters.

14          THE COURT:  But it is not what the SEC is aware of, it

15   is what the court is aware of.  I'm the one you have to

16   convince, not the SEC.

17          MR. BERKELEY:  Correct, your Honor.

18          THE COURT:  You already tried to convince them

19   apparently.

20          MR. BERKELEY:  No.

21          THE COURT:  They told you you're not convincing.

22          MR. BERKELEY:  No, your Honor.  I certainly recognize

23   that and I apologize if I made a statement to the contrary.

24          THE COURT:  What about that letter, counsel?

25          MS. BERLIN:  OK.  This is a letter -- I guess we are

1    all traveling into an argument, creative, that if you mention

2    something in another court, then that court suddenly has

3    jurisdiction even if they are not asked to make a decision.

4           THE COURT:  That is not what their argument is.  I

5    mean, that is what your response is.  Their argument is that in

6    New Jersey he is the subject of an SEC investigation regarding

7    Bahamian securities.

8           MS. BERLIN:  This is not true and I have provided the

9    court with the complaint and the amended complaint in that

10   case, which is currently on appeal.  There are zero allegations

11   about -- I don't think the Bahamas is mentioned.  SureTrader,

12   not mentioned.  15a-1 violations, not mentioned.

13          Why?  That is a penny stock fraud case where

14   Mr. Gentile was alleged to have manipulated the market in a

15   pump-and-dump scheme.

16          This investigation concerns unrelated conduct

17   involving different companies, different countries, different

18   sections of the securities laws.

19          But let's look at the May 9, 2017 letter.  It

20   states -- it's a letter from counsel to the judge and there is

21   a sentence in it that says -- and I'm not sure what this is

22   responding to or whether the judge did anything -- We are aware

23   of no new investigation that has been opened into Mr. Gentile's

24   conduct after the dismissal of the criminal indictment against

25   him.  As Mr. Gentile's counsel is well aware, the investigation

1    into his operation of his Bahamian broker-dealer has been

2    ongoing since before that indictment was filed.

3           I'm guessing the judge asked are there any new

4    investigations or indictments concerning Mr. Gentile and it

5    appears this is a response to that.

6           THE COURT:  Indicating that your investigation was

7    ongoing prior to the indictment.

8           MS. BERLIN:  Correct.

9           THE COURT:  Is that what it is talking about?

10          MS. BERLIN:  Yes.  It's been ongoing since before the

11   indictment, and that is one of the things that looks like this

12   is a letter responding to questions by the court about general

13   investigations.  It wants to know about criminal -- she's

14   referencing no new investigation has been opened since the

15   criminal indictment was dismissed.  And as Mr. Gentile knows,

16   the investigation into his operation of his Bahamian

17   broker-dealer has been going on since before that was filed.

18          THE COURT:  Can I see that?

19          MS. BERLIN:  Yes.

20          (Pause)

21          THE COURT:  So I don't understand.  What are you

22   saying this says other than it says there was an investigation

23   that's been ongoing prior to the indictment?

24          MR. BERKELEY:  Correct, your Honor.

25          THE COURT:  Where does it say that the investigation

1   is being conducted in New York or New Jersey and is part of the

2   penny stock investigation?

3       MR. BERKELEY:  Well, it's our position that that

4   investigation that they are talking about that's ongoing, that

5   is part of the 2016 case.  That case number is directly related

6   to Mr. Gentile and his Bahamian broker business.

7       THE COURT:  That's great that that's your position,

8   but do you have anything to support it?

9       You are giving me letters that don't say what you say.

10  The complaint in that case doesn't say that he is being charged

11  with selling Bahamian securities without properly registering

12  them.  That is complete speculation.

13      MR. BERKELEY:  I believe that the letters do reference

14  the Bahamian broker-dealer.

15      THE COURT:  It does.  It says there is an

16  investigation and there is an investigation.  We know it

17  because she told us there is an investigation.

18      MR. BERKELEY:  In New York there is an investigation

19  and that's what is in front of Judge --

20      THE COURT:  Of the Bahamas?  What evidence do you have

21  that in New York there is an investigation of the Bahamian

22  stuff?

23      MR. BERKELEY:  Well, unfortunately, as the SEC has

24  stated, they don't have to tip their hat too much to us so I'm

25  going by the pleadings that are ongoing in New York and what

1    the arguments are up there based upon counsel in New York and

2    my client.

3          Judge Linares, some of the SEC's own letters, as your

4    Honor is holding, does reference that the cases are related in

5    regard to his Bahamian broker activity.

6          THE COURT:  I don't understand where this says it is

7    related.  Nowhere does it say it is related.  You are telling

8    the court that he is still selling securities and they are

9    telling the court that there is a separate investigation that

10   was before the indictment that was into his Bahamian

11   broker-dealer.

12         Let me ask the SEC.  Is there an investigation in New

13   York or New Jersey in regard to his Bahamian broker-dealer?

14         MS. BERLIN:  Not that I'm aware of.

15         THE COURT:  Would you be aware of it?

16         MS. BERLIN:  I should be, yes.  I mean, unless it's

17   been opened in the last few days.

18         Can you give me a second?  I can actually confirm for

19   you.

20         THE COURT:  You can do that after we finish the

21   argument.

22         I don't see in here, counsel, where it says that it is

23   part of the New York or New Jersey investigation.

24         MR. BERKELEY:  Again, because the SEC and their

25   ability under the statute to not have to tip their hat and say

1   what it involves, I am representing to your Honor that those

2   letters which discuss an SEC investigation concerning that 2016

3   case and they reference that his Bahamian broker activity and

4   in the SEC's own pleading as set forth in the application, it's

5   highly relevant to their investigation.  So meaning his

6   broker-dealer activity.

7          THE COURT:  Right.

8          MR. BERKELEY:  So based upon the SEC's

9   correspondence -- again, I'd love to have a witness from the

10  SEC tell us, but they are telling us that they don't have to.

11  But we do know.

12         THE COURT:  You are shooting in the dark.  The case

13  law says you can't speculate about this stuff.  You have to

14  come in here with evidence.

15         MR. BERKELEY:  Right.

16         THE COURT:  These don't say what you say they say.

17  These don't lead me to believe that the SEC in New Jersey is

18  conducting an investigation of the Bahamian securities.  It

19  doesn't say that anywhere in here.  It says, hey, the guy is

20  dealing with the security business.  I mean, it just is far to

21  me this argument you're making that has no factual support.

22         MR. BERKELEY:  I guess --

23         THE COURT:  I just don't understand it.

24         MR. BERKELEY:  I guess my interpretation of the

25  letters is obviously different, but of course your Honor is the

1    one that does need to be convinced of it and I am --

2          THE COURT:  I want to know -- not only is it

3    different, it's unreasonable.  The letter says, hey, the guy's

4    still selling securities.  We think there should be an

5    injunction against him or the injunction shouldn't be stayed or

6    whatever because he is still selling securities.  We think he

7    shouldn't be allowed to sell securities and he's selling

8    securities relating to the Bahamas.

9          It doesn't say -- it just doesn't say what you say.

10   That would be like if the guy is being sentenced in New York

11   and someone said, oh, you should give him some more time

12   because he did something in Florida.  It doesn't mean that they

13   have the Florida case.

14         I think your argument is way out there.  It borders on

15   frivolity, don't you think so?

16         MR. BERKELEY:  Respectfully, however your Honor

17   interprets it obviously is, of course, where I will leave it.

18   I do believe, though, that those letters reference his Bahamian

19   broker activity --

20         THE COURT:  It does.

21         MR. BERKELEY:  -- and the SEC investigating that

22   activity.

23         THE COURT:  Correct.

24         MR. BERKELEY:  And that is correspondence between the

25   SEC in New York and a New York judge.

1      THE COURT:  New Jersey judge.

2      MR. BERKELEY:  New Jersey, you are correct.

3      THE COURT:  Right.

4      MR. BERKELEY:  So I am drawing what I perceive as a

5  plausible argument that if a New Jersey judge and the New York

6  office of the SEC are having conversations about Mr. Gentile's

7  Bahamian broker activity up there, that it is an issue that is

8  being addressed and I relate that to the Florida investigation,

9  the Florida SEC pleadings stating that it is highly relevant to

10  the SEC's investigation.

11      So you have two different divisions of the SEC

12  corresponding about the same thing to two different courts.  So

13  I do believe that that does create an issue where we should

14  figure out what's going on in the New Jersey court because we

15  put in our pleadings, for purposes of comity, you could

16  potentially have two different courts now discussing the same

17  issue, coming up with two different rulings.  I think that it

18  is uncontroverted that at a minimum those letters are

19  discussing up north the Bahamian broker activity and we are

20  discussing Bahamian broker activity down here.

21      There has got to be a correlation between the Bahamian

22  broker activity just based upon the evidence that is before us.

23  So that is where my argument is coming from, your Honor.

24      THE COURT:  OK.  What does the government say?

25      MS. BERLIN:  The government states -- a representation

1    has been made about comity.  Comity applies where you have the

2    same case pending in two different places.  We do not have that

3    situation.  We don't have the same party.  We don't have the

4    same issue.  Our investigation out of Miami is wholly different

5    from the New Jersey penny stock fraud case.

6          They both involve federal securities laws.  Guy

7    Gentile is a name we hear in both cases.  That is where the

8    similarity ends.  They involve different entities, different

9    other people, different types of conduct, different staff, and

10   completely separate formal orders.

11         So a lot of their argument rests on speculation about

12   what our investigation is and misstatements about the

13   investigation.

14         Contrary to the representations in their brief, this

15   investigation does not share a formal investigative order with

16   New Jersey.  They are completely separately authorized

17   investigations that began several years apart.  No overlap in

18   staff.  No overlap in the issues being reviewed.  They are

19   completely separate.

20         There is no connection other than what they have

21   represented.  But as I have expressed to the court, these

22   representations about our investigation have no basis in

23   reality.  They are not privy to it.  It is pure speculation.

24         Circling back, if I may, for one moment, your Honor,

25   on the issue of personal jurisdiction, it is such a

1   well-established issue that under the federal -- the federal

2   statute dictates where jurisdiction occurs, and that due

3   process under any federal statute with nationwide service, due

4   process dictates that you look at the U.S. as a whole for

5   minimum contacts.

6         You asked me for a case more specifically on that that

7   didn't involve a foreigner.  Here is one.  It is The SEC v. The

8   Committee on Ways and Means of the United States House of

9   Representatives.  In that case, which I just recalled sitting

10  here, but in that case -- it is, by the way, 14 NC-00193.  It

11  was decided November 11, 2015.

12        This is one of many cases where in this instance

13  staff, members of the U.S. House of Representatives, don't want

14  to have to go outside of D.C. to another district court where

15  the investigation is pending, and they made an argument that

16  they shouldn't have to.  The court did a very simple -- same

17  thing I wrote in my brief, where the statute is national

18  worldwide service, the only inquiry is contacts with the United

19  States.  Here, they have it.

20        Next, let's look at venue.

21        THE COURT:  What is the SEC doing suing the Ways and

22  Means Committee?

23        MS. BERLIN:  Right.  So that case, which was in 20 --

24  that case was filed in 2014 and decided, the order I just

25  mentioned to you was decided in 2015.  You will see if you look

1      at that case it involves the immunity of the members of the

2      House of Representatives, but it also involves the same issue

3      we're dealing with here today.

4              THE COURT:  Is this a published case or is this just

5      something you know about because -- you didn't give me a

6      Westlaw cite or anything.

7              MS. BERLIN:  I don't have a Westlaw cite, although I

8      could find you one.  It is a Southern District of New York

9      case, which is where the investigation was pending for that

10     case.  If I had a few minutes, I could probably find you a

11     dozen more.

12             What you won't find is any case that supports their

13     position that we would have to, instead of bringing the case

14     where our investigation is being conducted, we would have to go

15     to New Jersey where the person lives in order to enforce the

16     subpoena issued against her.

17             THE COURT:  Right.

18             MS. BERLIN:  You won't find any case law whatsoever to

19     support that.

20             I believe that I have addressed all of their

21     arguments.  I do want to state again that if your Honor would

22     like to hear more about --

23             THE COURT:  Do you think that's necessary?

24             MS. BERLIN:  No, I do not.

25             THE COURT:  OK.  Is there an affidavit that was

1   included with the complaint?

2           MS. BERLIN:  There is not an affidavit, but I do have

3   the person who is overseeing this investigation here who can

4   state what I have represented to the court in our application.

5           THE COURT:  OK.

6           MS. BERLIN:  Would you like to hear from her?

7           THE COURT:  Let me hear from counsel.

8           MR. BERKELEY:  Your Honor, if I may just briefly

9   quickly address the two issues in regard to the investigation

10  aspect of what is going on in New York and down here or New

11  Jersey and down here.

12          The SEC in and of itself can't even represent to the

13  court -- the SEC didn't even know about their own letter.  So I

14  am not sure if the SEC down here is even aware of what is going

15  on up in New Jersey.  So when we talk about speculation, at

16  least I am drawing links between some correspondence on the

17  SEC's own letterhead talking about a Bahamian broker-dealer up

18  there.  That's substantive evidence.

19          As it relates to the last issue that they just raised

20  with that case -- I haven't seen it, just hearing about it --

21  but I can only imagine that the court took into consideration

22  that you're dealing with a federal agency, federal employees,

23  members of the House of Representatives that probably exposed

24  themselves to the jurisdiction of where the enforcement was

25  just by being a federal employee and a member of the House of

1    Representatives.  But again, without reading the case I am

2    speculating on what the distinguishing aspects would be, but

3    that is what comes to mind, that you are dealing with, again,

4    Carrillo alien defendant scenario.  That case, federal employee

5    scenario.  Different than an individual residing in a

6    particular state.

7              THE COURT:  OK.  I think you should put on the record

8    sufficient facts to support that the agency has a legitimate

9    purpose for the investigation and that it is relevant to that

10   purpose.

11             MS. BERLIN:  Yes, your Honor.  I will present --

12             THE COURT:  That shouldn't be *in camera*.  I think you

13   need to do that either by way of affidavit or by way of

14   testimony.

15             MS. BERLIN:  Yes.  I believe it would be most

16   efficient, if it is OK with your Honor, to just call

17   Ms. Weissman to the stand and quickly inquire.

18             THE COURT:  OK.  That would be fine.

19             MS. BERLIN:  One thing before we bring the witness

20   into the courtroom is that, as we noted in our filing, we are

21   not required to and we will object to questions that go into

22   specific scope of the investigation that is outside of our very

23   minimal burden for simply showing there is a reasonable basis

24   for seeking the testimony.

25             THE COURT:  Yes.

1          MS. BERLIN:  Because our investigations are non-public

2    and we don't want Ms. Marin to use it as an opportunity to

3    learn what the SEC is looking at.

4          THE COURT:  I will listen to those objections.

5          MS. BERLIN:  Thank you.

6    JESSICA MARIA WEISSMAN,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MS. BERLIN:

11   Q.  Good morning.

12   A.  Morning.

13   Q.  Would you please tell us your title at the U.S. Securities

14   and Exchange Commission?

15   A.  I am an assistant regional director to the division of

16   enforcement.

17   Q.  And the assistant regional director, is one of your duties

18   to oversee investigations within the enforcement division of

19   the SEC?

20   A.  Yes.

21   Q.  Is the Traders Cafe investigation one of the matters that

22   you oversee?

23   A.  Yes.

24   Q.  And for how many years have you overseen that

25   investigation?

1    A.   For approximately four and a half years.

2    Q.   And are you familiar with the subpoenas issued to Carla

3    Marin in connection with the Traders Cafe investigation?

4    A.   Yes.

5    Q.   Is the Traders Cafe investigation related in any way to SEC

6    enforcement litigation concerning an individual named Guy

7    Gentile in New Jersey?

8    A.   No.

9    Q.   There's no connection whatsoever?

10   A.   None.

11   Q.   Does the Traders Cafe investigation involve different or

12   does it involve the same violations as those at issue in the

13   New Jersey matter?

14   A.   No, it does not.

15   Q.   Does it involve the same subject matter?

16   A.   No, it does not.

17   Q.   The same legal issues?

18   A.   No, it does not.

19   Q.   Is Carla Marin a party to the New Jersey case?

20   A.   No.

21   Q.   Are you or were you a member of the investigative team for

22   the New Jersey matter?

23   A.   No, I was not.

24   Q.   Does the Miami investigation share a final investigative

25   order with the New Jersey litigation against Guy Gentile?

1    A.   No.

2    Q.   Is there any connection between the Miami investigation and

3    the litigation against Guy Gentile in New Jersey?

4    A.   No.

5         THE COURT:  Is the investigation ongoing?

6         THE WITNESS:  Yes.

7         MS. BERLIN:  Your Honor, may I approach the witness --

8         THE COURT:  Yes.

9         MS. BERLIN:  -- concerning exhibits?

10        MR. BERKELEY:  Your Honor, I'm sorry.  I don't have

11   copies of the exhibits.

12        MS. BERLIN:  I could hand them out.

13        THE COURT:  OK.  You can give me a copy as well.

14   BY MS. BERLIN:

15   Q.   I am handing you what I am marking as Exhibit 1.

16        Is Exhibit 1 a copy of the SEC's formal order in the

17   Traders Cafe case?

18   A.   Yes, it is.

19   Q.   Does Exhibit 1 authorize the SEC to conduct the Traders

20   Cafe investigation?

21   A.   Yes.

22   Q.   And the Traders Cafe investigation under the formal order

23   is ongoing, correct?

24   A.   Correct.

25   Q.   The formal order doesn't have an expiration date, does it?

1    A.  It does not.

2    Q.  Does the formal order limit or dictate how you and your

3    team investigate violations under this formal order?

4    A.  No.

5    Q.  I would like to hand you what I am marking as Exhibit 2.

6            Is Exhibit 2 a subpoena issued to Carla Marin?

7    A.  Yes, it is.

8    Q.  Would you look at page 2, please.  Do you see the signature

9    line for Mr. Sajjad Matin?

10   A.  I do.

11   Q.  Was Mr. Sajjad Matin a member of your investigative staff

12   in September 2017?

13   A.  Yes.

14   Q.  And under Exhibit 1, the formal order, is Mr. Matin

15   authorized to issue subpoenas?

16   A.  Yes.

17   Q.  Generally speaking, why -- without disclosing anything

18   non-public about the investigation, could you tell us generally

19   why your team decided to issue Exhibit 2 to Ms. Marin?

20   A.  Because we were seeking information that was both critical

21   and essential to an ongoing investigation we were conducting.

22   Q.  I would like to hand the witness what I have marked as

23   Exhibit 3.

24           Is Exhibit 3 a December 6, 2017 subpoena your team

25   issued?

1    A.  Yes.

2    Q.  And if you turn to the fourth page in this Exhibit 3, do

3    you see that the subpoena was issued by Sajjad Matin as counsel

4    for the SEC?

5    A.  Yes.

6    Q.  And when Mr. Matin issued this subpoena to Ms. Marin, was

7    he authorized under Exhibit 1, the formal order in this case?

8    A.  Yes, he was.

9    Q.  Could you tell us generally -- well, did you have any role

10   in the decision to issue the subpoenas to Ms. Marin?

11   A.  Yes.  I am the supervisor of the investigation.  I

12   supervised Mr. Matin during the time he served as a staff

13   attorney with the division of enforcement in my regional office

14   at the SEC.

15   Q.  So in that capacity did you approve Mr. Matin issuing

16   subpoenas to certain people before they were sent out?

17   A.  Generally, yes.

18   Q.  And with respect to Exhibit 3, is this a subpoena that you

19   approved to be issued?

20   A.  Yes.

21   Q.  And tell us generally why the SEC believes that it needs

22   the information being sought in Exhibit 3?

23   A.  Because the information sought is both critical and

24   necessary for the ongoing investigation.

25   Q.  I am handing you what I have marked as Exhibit 4.

1            Ms. Weissman, is Exhibit 4 a November 2018 subpoena

2     issued to Ms. Marin?

3     A.  Yes.

4     Q.  And this one, if you turn to the fourth page, that's your

5     signature that we see there?

6     A.  Yes.

7     Q.  So you issued this subpoena to her?

8     A.  Yes.

9     Q.  And were you authorized under the formal order to issue

10    subpoenas?

11    A.  Yes.

12    Q.  Could you tell us generally why the SEC decided to seek

13    documents from Ms. Marin in the subpoena?

14    A.  Because the information sought pursuant to the subpoena was

15    both critical and necessary for the ongoing investigation.

16    Q.  And the specific document request being sought in this

17    subpoena, if you turn to page 4 of the subpoena or page 8 of 21

18    for the PDF, do you see the list of documents to be produced?

19    A.  Yes.

20    Q.  And that lists eight types of documents, correct?

21    A.  Correct.

22    Q.  And some of them concern an entity called Mint Custody.

23            Do you see that?

24    A.  Yes.

25    Q.  Mint Custody.  How does Mint Custody relate to Ms. Marin?

1    A.  With respect to the investigative file, our understanding

2    is that Ms. Marin exercised sole control over Mint Custody the

3    entity and its related bank accounts.

4    Q.  And so this subpoena which seeks documents from Ms. Marin

5    concerning herself and Mint Custody, why generally did you

6    decide to seek these documents?

7    A.  Because the documents were both necessary and critical to

8    the investigation.  We didn't have the investigative files.  We

9    believed that the entity or individual subpoenaed may have

10   them.

11   Q.  Do you still supervise the Traders Cafe investigation?

12   A.  Yes, I do.

13   Q.  And if the SEC does not obtain the evidence it sought in

14   subpoenas to Ms. Marin, will that hinder the SEC's

15   investigation?

16   A.  Yes, it would.

17   Q.  And how so?

18   A.  Because the evidence that we are seeking pursuant to these

19   subpoenas are critical and necessary for us to complete our

20   investigation.

21        THE COURT:  I think you have to do more than that.

22   That is just a conclusory statement.  You have to show how it

23   is relevant.

24        Here you talked about there were funds that were

25   moving from someplace to someplace that related to Mint.  I

1    mean just saying that it's relevant or critical is not

2    sufficient.

3         MS. BERLIN:  Your Honor, we have a very light burden

4    on showing relevance.

5         THE COURT:  I realize that, but it can't be

6    conclusory.  In here you have made factual statements about it

7    and those factual statements are not under oath.  So the

8    witness needs to testify in support of those statements, not

9    just that we need it because it's critical or relevant.

10         MS. BERLIN:  OK, your Honor.  May we proceed to do so

11    in a general fashion?

12         THE COURT:  You can proceed to do so in the fashion

13    that you laid it out in your pleading.

14         MS. BERLIN:  OK.

15         THE COURT:  I think it was in your motion or your

16    reply.  I'm not sure which one.  You indicated that there was a

17    movement of funds to Mint, which she already testified that

18    Ms. Marin is the owner or the controller of the company.  I

19    think it was in the application.

20         MS. BERLIN:  I would like to approach the witness with

21    what I am marking as Exhibit 5.

22         THE COURT:  OK.

23         MS. BERLIN:  It is a composite.

24         THE COURT:  In your application in paragraphs 4, 5 --

25         MS. BERLIN:  Yes.

```
 1              THE COURT:  -- and 6.

 2              MS. BERLIN:  We will go into that detail right now.

 3              THE COURT:  OK.  Thank you.

 4    BY MS. BERLIN:

 5    Q.  Ms. Weissman, handing you Exhibit 5.  Are these the

 6    business records that you received in your investigation for

 7    the Mint Custody bank account?

 8    A.  Yes.

 9              MR. BERKELEY:  Your Honor, if I may just object for

10    purposes of the record as to Exhibit 5.  These are banking

11    records that have not been authenticated pursuant to the Rules

12    of Evidence.  I don't have any records custodian.  I don't know

13    if they are legitimate, how they got them, and there is no

14    business records custodian affidavit pertaining to these

15    records.  So I would object.

16              THE COURT:  The objection is overruled.

17              Go ahead.

18    BY MS. BERLIN:

19    Q.  So looking at the business account application, does this

20    indicate that Ms. Marin has a connection to Mint Custody?

21    A.  Yes.  On page 1 of the business account application for

22    Wells Fargo it states that the customer was Mint Custody, Ltd.

23    and that the sole owner of Mint Custody, Ltd. is Carla L.

24    Marin.

25              THE COURT:  Where does it say that?
```

1          THE WITNESS:  It says it under "related customer

2     information."  It is the second section underlined.

3          THE COURT:  Oh, I see it.  Account relationship.  OK.

4     BY MS. BERLIN:

5     Q.  And if you turn to page 2, do you see at the top where it

6     says "customer information?"

7     A.  Yes.

8     Q.  And it states here Mint Custody, Ltd. and Ms. Marin is the

9     sole owner.

10          Do you see that?

11    A.  Yes, I do.

12    Q.  Looking down the page do you see the description of

13    business?

14    A.  Yes.

15    Q.  And what is the description of business according to this

16    bank account application?

17    A.  The business subtype or the business type?  Which one are

18    you asking for?

19    Q.  Do you see where it says description of business, Holding

20    Custody, on page 2?

21          MS. BERLIN:  May I approach the witness?

22          THE COURT:  Yes.

23    A.  I see it now.  Yes.  Under description of business on page

24    2 of this exhibit it states Holding Custody.

25    Q.  And it states, according to this document, that Carla

1  Marin, Holding Custody are in Carmel, New York.

2          Do you see that?

3  A.  Yes, I do.

4  Q.  You can set aside Exhibit 5, please.

5          In connection with the Traders Cafe investigation, is

6  one of the things you are investigating whether there has been

7  unregistered broker-dealer contact with the United States

8  through a Bahamian-registered entity and its owners?

9  A.  That's correct.

10  Q.  So would the movement of money from that unregistered

11  broker-dealer through the United States be relevant to your

12  inquiry?

13  A.  Yes.

14  Q.  And generally speaking, is the movement of investor funds

15  from a Bahamian offshore broker-dealer through a United

16  States-based holding company like Mint Custody, is that

17  relevant to your analysis as well?

18  A.  Yes.

19  Q.  And would such conduct indicate or provide information

20  about an overseas broker-dealer's contacts in the United

21  States?

22  A.  Yes, it would.

23  Q.  The movement of money through U.S. bank accounts?

24  A.  Yes.

25  Q.  That's a connection to the U.S. that you would want to know

1   about?

2   A.  Yes.

3   Q.  Is that relevant to the violation that you're

4   investigating?

5   A.  Yes, it is.

6   Q.  So in connection with your investigation, did you have an

7   opportunity to review the bank account statements from Mint

8   Custody?

9   A.  I did.

10  Q.  And in your review of the Mint Custody bank account

11  records, was there any indication about money being deposited

12  in that account from the offshore broker-dealer and other

13  people you're investigating?

14  A.  Yes.

15  Q.  And was there also evidence about the flow of that money

16  out of the Mint Custody accounts?

17  A.  Yes.

18  Q.  Who was the sole signatory on the Mint Custody accounts?

19  A.  Carla Marin.

20  Q.  So who received the investor money from overseas?

21  A.  Ms. Marin.

22  Q.  And who distributed that money once it got to the United

23  States?

24  A.  Ms. Marin.

25          MR. BERKELEY:  Your Honor, if I may just object for

1    purposes of the record.  I am unsure if the witness is

2    testifying from personal knowledge or based upon information

3    that she's gleaned from other parties.  I don't think we have

4    established that she has personal knowledge of this directly.

5              THE COURT:  You can ask her a question about it.

6              MS. BERLIN:  Certainly.

7    BY MS. BERLIN:

8    Q.  Is everything you have testified about here today based on

9    information you learned in the course of your work as the

10   assistant regional director for the Miami regional office?

11   A.  Yes, it is.

12   Q.  So you don't have personal knowledge of what Ms. Marin did

13   or did not do, you're testifying about what your investigation

14   has shown you, correct?

15   A.  Correct.

16   Q.  And the testimony you just provided about the movement of

17   funds, what did you look at to see the movement of money in

18   Ms. Marin's bank accounts?

19             MR. BERKELEY:  I would object, your Honor, based upon

20   hearsay.  Her testimony is going to be about documents that she

21   looked at that are not here in court, that are not

22   authenticated.  It's hearsay.  It is not from her own personal

23   knowledge.

24             THE COURT:  What do you say to that?

25             MS. BERLIN:  Your Honor, the inquiry here is whether

1    we can meet our minimal burden of showing that Ms. Weissman has

2    a reasonable basis for issuing a subpoena to Ms. Marin.

3    Obviously we don't have a trial to show that the documents she

4    reviewed are relevant.  We are not bringing them in for the

5    truth of the matter asserted.  We are simply trying to show the

6    mindset of our investigative team and why they think the

7    subpoena is relevant.

8         THE COURT:  The objection is overruled.

9    BY MS. BERLIN:

10   Q.  You have reviewed Ms. Marin's bank account records to see

11   the movement of money?

12   A.  Yes, I did.

13   Q.  And following the money trail in this case, did it lead to

14   Ms. Marin and her entity?

15   A.  Yes, it did.

16   Q.  And is that one of the reasons you're seeking information

17   from her?

18   A.  That's correct.

19        MS. BERLIN:  Your Honor, we do have bank records and

20   other documents that are non-public that unless it would be

21   helpful to the court we do not plan to submit.  We were hoping

22   that Ms. Weissman's statements about her review of these

23   documents is adequate.

24        THE COURT:  OK.  So any cross-examination of this

25   witness?

```
 1            MR. BERKELEY:  Yes, your Honor.

 2            THE COURT:  The five exhibits are admitted.  You are

 3    going to need to submit an exhibit list and talk to Sherry

 4    after.  You have to file them electronically or whatever the

 5    local rule is.

 6            MS. BERLIN:  Yes.

 7            (Government's Exhibits 1-5 received in evidence)

 8            THE COURT:  Go ahead, counsel.

 9            MR. BERKELEY:  Thank you, your Honor.

10    CROSS EXAMINATION

11    BY MR. BERKELEY:

12    Q.  Ms. Weissman, you and I actually spoke at the very

13    beginning of my involvement in this matter, correct?

14            MS. BERLIN:  Objection.  Relevance.

15            THE COURT:  Overruled.

16    BY MR. BERKELEY:

17    Q.  Is that correct?

18    A.  Yes.

19    Q.  Are you an attorney?

20    A.  Yes, I am.

21    Q.  And you're an attorney that's investigating this particular

22    matter, correct?

23    A.  Yes.

24    Q.  OK.  And you are now obviously testifying about your own

25    investigation, correct?
```

1  A.  It's not my investigation per se.  It is an SEC

2  investigation that I am supervising.

3  Q.  And this is an investigation that you control, correct?

4  A.  No.

5  Q.  Who controls the investigation?

6        MS. BERLIN:  Objection.  Relevance about the internal

7  workings of the SEC.

8        THE COURT:  Overruled.

9  A.  There are many layers of supervision above my role,

10  including --

11  Q.  I am trying to understand your involvement in this case and

12  what you know and how you know it, because it appears that

13  you're testifying about your own investigation right now which

14  would call into question some of your testimony and potential

15  bias.  So I'm trying to understand your involvement in the

16  investigation.

17        So what is your involvement in the investigation?

18  A.  I am a supervisor of the investigation.

19  Q.  What does that mean?

20  A.  That means that I supervise people below me.  But as of now

21  Mr. Matin left the SEC so I now am working with Ms. Berlin on

22  the investigation.

23  Q.  Are you the one that is directing these subpoenas?

24  A.  I'm trying to understand what you mean by that.

25  Q.  Are you the one that is directing the people below you to

1    issue these subpoenas?

2    A.   Which subpoenas are you talking about?   The ones we just

3    reviewed?

4    Q.   Yes.   Carla Marin.

5    A.   It's a combination of a staff attorney's own discretion

6    based off of his or her own investigative authority as well as

7    being supervised by me.

8    Q.   Who made the final determination to issue the subpoena to

9    Carla Marin?

10            MS. BERLIN:   Objection.   Relevance, your Honor.

11            THE COURT:   Overruled.

12   A.   It's a collaboration of individuals within the division of

13   enforcement.

14   Q.   Were you part of that?

15   A.   Yes.

16   Q.   Now, the purpose of the investigation is what?

17   A.   I'm not sure I understand the question.

18   Q.   What is the purpose of this investigation that revolves

19   around the issuance of the subpoena?   What is the purpose of

20   the investigation?   Does the SEC not have a purpose for this

21   investigation?

22   A.   Our investigations are non-public and confidential.   I'm

23   struggling to answer the question without violating the ethical

24   obligations.

25            MS. BERLIN:   Objection, your Honor.   We have put the

1    formal order of investigation into evidence which identifies

2    this is an authorized investigation.

3         I would also like to identify the U.S. Supreme Court

4    case law on the issue of inquiring about our investigations.

5    As stated in my footnote 3 in my reply brief, your Honor, the

6    U.S. Supreme Court in the SEC v. Jerry T. O'Brien case stated

7    that the Commission does not need to lay bare the state of its

8    knowledge and intentions in the investigation, but such

9    exposure could significantly hamper the Commission's efforts to

10   police violations of the securities laws.

11        Questions beyond generally what is the investigation

12   about, which we have provided --

13        THE COURT:  He is cross-examining.  He is only

14   cross-examining on what you provided.

15        MR. BERKELEY:  Correct.

16        THE COURT:  What you provided he gets to ask about.

17        I don't understand what is so confusing.  I don't

18   remember the exact question, but it was like what is the basis

19   of the investigation.  The basis is that we are investigating

20   trader whatever it is and the movement of money from the

21   Bahamas to the United States.

22        MS. BERLIN:  Your Honor, my point is my questions were

23   very general and Ms. Weissman answered generally because she

24   cannot testify further.  Our investigations are non-public.

25        The Supreme Court also states we don't have to give

1    any specific details about our investigations.  I'm sure

2    Ms. Marin would love to know --

3          THE COURT:  A better way I think to have proceeded on

4    this would have been to submit an affidavit, because then with

5    the affidavit counsel could make the argument of whether or not

6    he needed to cross-examine.  And generally when an affidavit is

7    submitted, generally there is no cross-examination.  You meet

8    the elements of what you have to do.  But here you decided to

9    put her on the stand.  She's testified to certain stuff.  He is

10   not going into details of the investigation or anything that is

11   not already made public.  So the objection is overruled.

12         I understand your concern, but I don't see what he is

13   asking is asking you to bare the state of your investigation.

14         MS. BERLIN:  OK.  Your Honor, also because we

15   understood that we are here on an order to show cause issued to

16   Ms. Marin, the court has already found that we have met our

17   minimal burden.  So the burden has shifted under the court

18   order to Ms. Marin to indicate why it shouldn't be imposed.

19         THE COURT:  Well, I didn't find because there was no

20   evidence in front of me.  That is why I was concerned whether

21   there was an affidavit.  I don't know how you could meet your

22   burden without presenting testimony either by way of affidavit

23   or by way of testimony.  That is why I inquired about that.

24         MS. BERLIN:  Thank you.

25         THE COURT:  Go ahead.

1          MR. BERKELEY:  Thank you, your Honor.

2    BY MR. BERKELEY:

3    Q.  So what is the purpose of the Traders Cafe investigation?

4    A.  To investigate potential violations of the federal

5    securities laws.

6    Q.  And do you believe that Carla Marin may have violated

7    potential securities laws?

8          MS. BERLIN:  Objection, your Honor.  Relevance and

9    also citing to the U.S. Supreme Court --

10         THE COURT:  That objection is sustained.

11         The proper question is do you think she has records

12   that relate to this investigation.  That question you can ask

13   if you'd like.

14   BY MR. BERKELEY:

15   Q.  Do you think that she has --

16         MR. BERKELEY:  Thank you, your Honor.

17   Q.  Do you think that she has documents or information relevant

18   to that information?

19   A.  Yes.

20   Q.  Why is it that you think that?

21   A.  Because she is the sole owner, the sole signature and the

22   sole employee of Mint Custody, an entity that she found that

23   also did banking with Wells Fargo, and from our review we saw

24   the movement of U.S. resident customer funds, moneys that were

25   there for the purposes of ultimately having those funds

1    transferred to a Bahamian-registered broker-dealer not

2    registered with the SEC.

3    Q.  Is that transfer in and of itself an illegal activity?

4              MS. BERLIN:  Objection, your Honor.

5              THE COURT:  Overruled.

6              You can answer the question.

7    A.  I'm not sure that's part of my job to determine whether

8    something is, quote-unquote, illegal.  We have a five-person

9    Commission that is our client.  They are the ones to make the

10   determinations at the end of the day.  We only make

11   recommendations.

12   Q.  So you have no idea whether your investigation serves a

13   legitimate purpose of investigating illegal or legal activity?

14   A.  I didn't say that.

15   Q.  Well, then what are you saying as to whether or not the

16   transaction that you are investigating is legal or not legal?

17   You don't even know that?

18   A.  The purpose of an investigation, what I am charged to do in

19   my 18 years with the SEC is to investigate potential violations

20   of the federal securities laws.  That is exactly what we were

21   doing in connection with the subpoenas issued to Ms. Marin.

22   Q.  Now, how long has that investigation been going on?

23   A.  I was not the original supervisor of the investigation.  I

24   inherited it in December of 2014.

25   Q.  So since 2014 you still don't know whether or not any

```
 1    inappropriate or illegal activity has gone on?
 2              MS. BERLIN:  Objection.  Argumentative and not
 3    relevant.
 4              THE COURT:  Sustained.
 5    BY MR. BERKELEY:
 6    Q.  The investigation that is ongoing is still ongoing from
 7    2014, correct?
 8    A.  The investigation is ongoing, correct.
 9    Q.  And has the SEC made any determination yet whether or not
10    any illegal activity has taken place?
11              MS. BERLIN:  Objection, your Honor.  Goes into work
12    product and investigation.
13              THE COURT:  Sustained.
14    Q.  The document -- how will these documents that you're
15    seeking to obtain from Ms. Marin assist the SEC in its
16    investigation?
17              MS. BERLIN:  Objection, your Honor.  Attorney work
18    product.  Law enforcement privilege.
19              THE COURT:  Overruled.
20              You can answer the question.
21    A.  The documents that we seek pursuant to the subpoena issued
22    to Carla Marin, the subpoena obviously calls for both testimony
23    and documents.  But with respect to the documents, the
24    documents will help assist us in identifying the movement of
25    U.S.-based customer funds from the U.S. to the
```

1   Bahamian-registered broker-dealer.

2   Q.   Now, the investigation and these documents are actually

3   Mint Custody documents, is that correct?

4   A.   I don't have any documents that have been produced pursuant

5   to this subpoena so I can't formally or answer that with

6   certainty.

7   Q.   Well, the documents that form the basis of your subpoena --

8   partially we have already seen them -- are the Wells Fargo bank

9   accounts, right?

10  A.   That's wholly a part of what has been requested in the

11  documents subpoena.

12  Q.   We are dealing with evidence that is before the court.  So

13  these are the cards I am being dealt, and what I am being dealt

14  is a Wells Fargo --

15          MS. BERLIN:   Objection, your Honor, to the lead-in to

16  the question.

17  Q.   -- bank account directly to Mint Custody, is that correct?

18          THE COURT:   Overruled.

19  A.   Can you repeat the question?

20  Q.   These are Wells Fargo bank accounts of Mint Custody, not

21  Carla Marin individually, correct?

22  A.   Yes, but you were just asking me a question about what I

23  was looking for in connection with the subpoena and now you're

24  shifting to an exhibit that's been marked in my testimony

25  today.

1    Q.  That's correct.  I'm trying to relate your own subpoena

2    directed to Carla Marin individually, Guy Gentile's personal

3    attorney, to Mint Custody records.  You are right.

4          Let's straighten that confusion out because we are

5    looking at Mint Custody records yet discussing a subpoena

6    issued to Carla Marin.  I'm trying to understand the relation.

7    A.  Carla Marin is the sole owner, sole signatory, sole

8    employee and forms Mint Custody.  The Wells Fargo bank accounts

9    are just one part of that.  In addition, the subpoena calls for

10   far more than Wells Fargo bank accounts or account opening

11   documents.

12   Q.  Let's talk about that subpoena because there's been a

13   couple of them issued.

14          The documents to be produced pertain to Swiss America,

15   SureTrader, correct?

16   A.  Which subpoena are you referring to, please?

17   Q.  Let's talk --

18          MS. BERLIN:  Your Honor, we object if this is going

19   outside the scope of their arguments.  If there is an issue

20   with the specific questions, those need to be put in a response

21   to the subpoena which Ms. Marin has never provided.

22          THE COURT:  I think he can attack the relevance of the

23   items that are requested in the subpoena.  That is one of the

24   things that you have to meet.

25          MR. BERKELEY:  Thank you, your Honor.

1        THE COURT:  Which subpoena are you looking at?

2        MR. BERKELEY:  I am going to -- if we are looking at

3   the SEC's --

4        THE COURT:  Can you use the documents that she

5   provided you that are marked as Exhibits 1 through 5?  Included

6   are the three subpoenas.

7        MR. BERKELEY:  Exhibit No. 3, your Honor.  That's been

8   submitted today, your Honor.  Exhibit 3.

9        THE COURT:  OK.

10       MR. BERKELEY:  On the top it would say page 9 of 15.

11       THE COURT:  Got it.

12       MS. BERLIN:  Objection, your Honor.  This subpoena is

13   not in effect.  We are not seeking to enforce it.

14       THE COURT:  OK.  Why don't you look at Exhibit 4.  Is

15   that the one you're trying to impose?

16       MS. BERLIN:  Yes.

17       THE COURT:  Is the attachment the same?

18       MR. BERKELEY:  Let me see Exhibit 4.  OK.  So then for

19   purposes of the record, then, this subpoena, Exhibit 13 to

20   their application, the SEC is abandoning this subpoena?  They

21   are not seeking to enforce this subpoena?

22       MS. BERLIN:  Your Honor, as counsel well knows, he

23   claimed that after conferring with us about that subpoena, he

24   claimed his client never received it and was never served.

25   Accordingly, as he well knows, we re-served her.  That's

```
 1   Exhibit 4.
 2              Per our application we are seeking to enforce the 2017
 3   subpoena for testimony and Exhibit 4, the December 2018
 4   subpoena for documents.
 5              THE COURT:  OK.
 6              MR. BERKELEY:  I'm just looking for Exhibit 4, your
 7   Honor.
 8              THE COURT:  The documents to be produced on page 8 of
 9   21 on Exhibit 4.
10              MR. BERKELEY:  OK.  I see that, your Honor.  Thank
11   you.
12   BY MR. BERKELEY:
13   Q.  So the documents to be produced, we can look through those
14   on page 8 of 21.
15              The stock ledger from Mint Custody, correct?
16   A.  That's what item 1 says, yes.
17   Q.  Now, let's scroll down to No. 3.  You're asking for the
18   State of Delaware corporate records for Mint Custody?
19   A.  Included but not limited to the State of Delaware.
20   Q.  Is that because Mint Custody is a Delaware entity?
21   A.  I'm not certain of that information off the top of my head.
22   Q.  So in your own subpoena you don't know what you are asking
23   for?
24   A.  I didn't sign this subpoena and I also don't have a memory
25   of every subpoena, particularly when that -- I sign many
```

1    subpoenas.  I would have to look at my file.

2    Q.  Do you have any memory of Mint Custody ever doing any

3    business in the State of Florida?

4    A.  Not that I can recall off the top of my head without

5    looking at my files.

6    Q.  OK.  Let's move on to No. 5, communications concerning Mint

7    Custody and Swiss America doing business as SureTrader and Mint

8    Broker.

9         Are those Guy Gentile's entities, 5(a)?

10   A.  Yes.

11   Q.  Is Guy Gentile currently being investigated in New Jersey?

12        MS. BERLIN:  Objection.  Relevance.  Outside the scope

13   of what we're doing here.

14        THE COURT:  Sustained.

15        MR. BERKELEY:  Judge, just real quick.  Obviously the

16   SEC to meet their burden has to establish a legitimate purpose,

17   relevant purpose that the agency doesn't have the documents in

18   their possession and that they have adhered to administrative

19   steps.  I would argue that question is related to the

20   administrative steps that they have adhered to to ensure that

21   they are not violating and circumventing the New Jersey courts

22   by simultaneously conducting an investigation down here that's

23   directly related to New Jersey which, as your Honor knows, we

24   are asserting.  That is an administrative step.  They are an

25   administrative agency.  The left hand must know what the right

1   hand's doing.

2          THE COURT:  I find that's not proper examination

3   because there's been no showing by you that -- it is only

4   speculative.  The showing has been that there is a complaint

5   against him that relates to penny stock fraud.  There has been

6   no showing that any of that stuff relates to Bahamas other than

7   two letters to a judge that said, by the way, he's still

8   selling stocks, Bahamian stocks as a stockbroker.  So you are

9   not allowed under the law to -- you are not even allowed in an

10  evidentiary hearing generally without coming up with

11  substantive defenses, which you haven't been able to show to

12  me.

13         So you may ask her questions in regards to her prior

14  testimony, but I'm not going to go into the New Jersey

15  investigation with her or I'm not going to allow you to.

16         MR. BERKELEY:  Thank you, your Honor.  However, on

17  direct examination Ms. Berlin did ask whether or not the

18  investigation down here is related to up there.  So I'm just

19  trying to inquire as to that issue.

20         THE COURT:  And what is your question?

21         MR. BERKELEY:  My question is, is Swiss America, the

22  documents that they are seeking in this subpoena, doing

23  business as SureTrader related to Guy Gentile.

24         THE COURT:  She answered that yes.

25         MR. BERKELEY:  Yes, she did, and then the followup

1  question was whether or not she knows whether that is part of

2  the same investigation in New Jersey.

3          THE COURT:  OK.  I will allow that.

4          MS. BERLIN:  To the extent there is an investigation

5  in New Jersey.  I mean --

6          THE COURT:  Of course.

7          MS. BERLIN:  -- why don't we start with that premise.

8          MR. BERKELEY:  Your Honor, is she directing the

9  witness what to testify to --

10          MS. BERLIN:  Objection, your Honor.  Foundation for

11  the question.

12          MR. BERKELEY:  -- or is she objecting.

13          THE COURT:  Overruled.

14          Answer the question.

15  A.  I'm not certain what the question is.  Can you ask it

16  again?

17  Q.  Sure.

18          The question is whether or not these documents that

19  you're seeking in this subpoena that relate to Guy Gentile

20  relate to the investigation in New Jersey.

21  A.  No.

22  Q.  Have you spoken to the SEC investigators in New Jersey?

23          MS. BERLIN:  Objection, your Honor.  Attorney work

24  product.

25          MR. BERKELEY:  I'm not asking what they said.  I'm

1    just asking have they communicated with each other.

2         MS. BERLIN:  Relevance.

3         THE COURT:  Overruled.

4         You can answer the question.

5    A.  Within the New Jersey office?  I'm still not sure who

6    you're talking about.

7    Q.  Have you spoken with your New York office about this

8    investigation and Guy Gentile?

9    A.  This investigation meaning the Miami investigation?

10   Q.  Yes.

11        MS. BERLIN:  Objection.  Relevance.

12        THE COURT:  Sustained.

13   Q.  Have you spoken to the New York office concerning the Guy

14   Gentile investigation up in New York?

15        MS. BERLIN:  Objection.  Relevance.

16        MR. BERKELEY:  Your Honor, it is relevant towards the

17   exact issue as to whether or not the SEC knows what they're

18   doing down here and what they're doing up there.  They have

19   asserted that opposing our stay action, our stay request in our

20   pleadings saying one has nothing to do with the other.  Our

21   assertion in our pleadings is that they are related.  She's

22   opened that door.  I'm just inquiring about it.

23        THE COURT:  Well, I think you can -- the problem is

24   that you don't have any evidence to show and you're not allowed

25   in an evidentiary hearing to establish that until you come up

1    with something more than speculation, and you have not come up

2    with anything further than speculation.

3             The New Jersey investigation, the records show that

4    relates to a penny stock fraud, not to a Bahamian securities

5    fraud.

6             MR. BERKELEY:  That's not true.  We haven't seen the

7    record of that proceeding.  We have just heard representations

8    from Ms. Berlin.

9             THE COURT:  No, they filed the complaint for that.

10   It's attached to their, I forget if it is to the initial

11   application or to their motion.

12            MR. BERKELEY:  Correct.  But just like their formal

13   order of investigation based in 2013, now six years later

14   spreads out to other things, completely unrelated to Traders

15   Cafe.  That complaint, as evidenced by those letters that I

16   provided, which are stamped, stamped as filed in that

17   proceeding and are part of the record, discuss the Bahamian

18   broker entity because I am asserting that it is part of the

19   record as those letters are stamped, documented part of the

20   record --

21            THE COURT:  I don't have any problem with that.  What

22   I am telling you, though, is you haven't presented any evidence

23   that would support an evidentiary hearing in regards to whether

24   the -- what they are doing in New Jersey.  The only evidence,

25   the only substantial evidence is that it was a penny stock

1    investigation.  That's what the judge has authority over there.

2    That is what the judge has stayed.  That is what is up on

3    appeal.

4           MR. BERKELEY:  It is actually not the entirety of it

5    because part of that action seeks to prevent Mr. Gentile from

6    conducting any further business, including that of being a

7    Bahamian broker.

8           THE COURT:  I have heard that argument.  You're not

9    allowed to inquire as to the New Jersey investigation any

10   further.

11          MR. BERKELEY:  Prior to that particular ruling, your

12   Honor, your Honor did state whether or not she could answer,

13   did state that she can answer whether she has spoken to the New

14   York office about Guy Gentile or Swiss America, which is the

15   subject matter of this subpoena right here.

16          THE COURT:  OK.  Go ahead and answer that question.

17   A.  On occasion, yes.

18   Q.  So you are conferring, then, with the New York office about

19   the Guy Gentile investigation?

20          MS. BERLIN:  Objection.  Relevance.

21          THE COURT:  Overruled.  I mean sustained.

22          Asked and answered is the proper objection.

23   Q.  So let's move now to No. 6, all documents concerning

24   agreements by or on behalf of you with the benefit of Swiss

25   America, Guy Gentile, or Mint Custody.

1          Those are documents that serve what purpose?

2    A.   Those are documents based off of the belief that Mint

3    Custody held U.S.-based customer funds ultimately for the

4    benefit of Swiss America, known as Mint Broker International,

5    which is owned by or controlled by Guy Gentile.

6    Q.   Has the investigation indicated that anything from Traders

7    Cafe went from SureTrader or to Mint Custody --

8          MS. BERLIN:  Objection.

9    Q.   -- which is the purpose of the FOI?

10          MS. BERLIN:  Objection.  Relevance.

11          THE COURT:  Sustained.

12   Q.   Is the Traders Cafe investigation as it relates directly to

13   the members of Traders Cafe, have those individuals closed out

14   their matters with the SEC?

15          MS. BERLIN:  Objection.  Relevance, your Honor.

16          THE COURT:  Sustained.

17   Q.   Are you pursuing the members of Traders Cafe any further?

18          MS. BERLIN:  Objection.  Relevant and non-public

19   investigation.

20          THE COURT:  Sustained.

21          MR. BERKELEY:  It is relates to the purpose, the whole

22   purpose of your subpoena and whether or not what their

23   investigation relates to is Traders Cafe.  If they have

24   prosecuted the Traders Cafe people, that investigation in

25   theory should cease and be over.

```
 1          THE COURT:  The objection is sustained.
 2   BY MR. BERKELEY:
 3   Q.  Do you believe that one of the administrative steps that
 4   have to be followed is establishing personal jurisdiction over
 5   the recipient of the subpoena?
 6          MS. BERLIN:  Objection.  Relevance.  Irrelevant what
 7   she personally thinks, and to the extent it is calling for her
 8   as an expert witness on the law, I am the trial attorney in
 9   this case and represent the SEC.
10          MR. BERKELEY:  Your Honor, it is one of the elements
11   that have to be proven.  She has offered this witness up to
12   help establish that they have met the four requirements for the
13   compliance of the affidavit, and --
14          THE COURT:  What difference does it make if she thinks
15   you have to establish personal jurisdiction or you don't?  How
16   does that move the case further one way or the other?  The
17   issue is whether or not personal jurisdiction has been
18   established.
19          MR. BERKELEY:  The issue is whether or not --
20          THE COURT:  The objection is sustained.
21          MR. BERKELEY:  The issue is whether or not it has been
22   established.
23          THE COURT:  You should have the proper witness for
24   that.
25   Q.  Do you have any knowledge about personal jurisdiction in
```

```
 1    regard to these --

 2            THE COURT:  No more questions regarding personal

 3    jurisdiction.

 4            MR. BERKELEY:  At this point, your Honor, you have

 5    stated that I cannot inquire anything about the New Jersey

 6    action either --

 7            THE COURT:  Nothing further than you have already

 8    inquired about.

 9            MR. BERKELEY:  -- and not inquire about personal

10    jurisdiction.  OK.

11    BY MR. BERKELEY:

12    Q.  The formal order of investigation that you have attached as

13    Exhibit 3 to your application --

14            THE COURT:  Just so we can keep this, because

15    someone's going to be looking at this record.

16            MR. BERKELEY:  Right.

17            THE COURT:  Presumably Judge Ungaro or maybe someone

18    somewhere else.  I believe that is Exhibit 1 today.

19            MR. BERKELEY:  OK.

20            THE COURT:  So if we can keep the -- it is going to be

21    very confusing for someone who is looking for Exhibit 3, which

22    is a subpoena.

23            MR. BERKELEY:  Correct, your Honor.

24            THE COURT:  And it will just be easier if we can use

25    the same documents or the same numbers.
```

1    MR. BERKELEY:  Thank you, your Honor.

2    BY MR. BERKELEY:

3    Q.  Exhibit 1 from today, letter B, could you please read that.

4    A.  "In possible violation of Sections 5a and 5c of the

5    Securities Act of 1933" --

6    THE COURT:  I am not going to spend time listening to

7    her read this.

8    MR. BERKELEY:  OK.

9    THE COURT:  You want her to read it to herself or you

10   want her to read it to me?

11   MR. BERKELEY:  I will ask a direct question.

12   THE COURT:  OK.

13   BY MR. BERKELEY:

14   Q.  What is the violations of sections 5a and 5c of the

15   Securities Act?

16   A.  They are generally registration violations.

17   Q.  Meaning that a particular company or entity is not properly

18   registered with the SEC?

19   A.  Generally, yes.

20   Q.  OK.  And here Traders Cafe, were they properly registered

21   with the SEC?

22   MS. BERLIN:  Objection.  Relevance.

23   THE COURT:  Sustained.

24   Q.  This formal order of investigation is In Re the Matter of

25   Traders Cafe, correct?

```
 1   A.   Yes.

 2   Q.   So it is investigating Traders Cafe, LLC, correct?

 3   A.   That's the title of the investigation, but it is not

 4   limited to Traders Cafe.

 5   Q.   OK.  And it is whether or not, according to Section (b),

 6   Traders Cafe's officers, directors, employees, partners,

 7   subsidiaries, affiliates or other persons or entities may have

 8   been offering to sell or deliver after sale to the public

 9   securities?

10   A.   Where are you reading that from, or is that your summation?

11   Q.   No.  It is in Section (b)?

12   A.   That is what Section (b) of the formal order states, yes.

13   Q.   OK.  And so it's your belief that the relevant purpose of

14   the subpoena is because Ms. Marin has engaged in or potentially

15   engaged in such activity?

16        MS. BERLIN:  Objection, your Honor.  Relevance.  I

17   believe you have ruled on this already and sustained the

18   objections to inquiring about what the SEC thinks Ms. Marin may

19   or may not have violated.

20        THE COURT:  Sustained.  Well, I don't think it is --

21   what she may have violated I don't think I have ruled on.  What

22   they have determined she violated or someone else violated,

23   I've sustained the objection.

24        You have to meet a burden as to why these documents

25   are relevant to the Traders Cafe.  Whether or not she -- she
```

1    may not have committed a violation, but someone had to -- these

2    things have to relate to somebody committing a violation that

3    relates to Trader Cafe.  Whether it is her or whether it is

4    Traders Cafe or whether it is Gentile.  She may just be an

5    innocent person that happens to have a company that they are

6    running funds through.  I have no idea.

7           MR. BERKELEY:  That's correct, your Honor.  So I was

8    jugs trying to understand whether that legitimate and relevant

9    purpose has been met pursuant to the witness' testimony as she

10   is the supervisor of the investigation.

11          THE COURT:  And what is your pending question?

12          MR. BERKELEY:  The pending question is, is it her

13   belief -- because the subpoena's issued to Ms. Marin.  So is it

14   your belief that Ms. Marin participated in this particular

15   potential violative activity.

16          MS. BERLIN:  Objection.  Relevance.

17          THE COURT:  The objection is sustained on that.

18          MR. BERKELEY:  One minute, your Honor.  Let me just

19   look at my notes over here.

20          THE COURT:  The inquiry is whether or not the

21   documents that Ms. Marin may possess or the knowledge she may

22   possess is relevant to the investigation.  Not whether

23   Ms. Marin did something wrong.

24          (Pause)

25   BY MR. BERKELEY:

1    Q.  The Traders Cafe investigation, though, is guided by

2    Exhibit 1, the formal order of investigation, correct?

3    A.  I don't know what you mean by guided.

4    Q.  Well, the formal order of investigation is the Commission's

5    authority to conduct an investigation, correct?

6    A.  Yes.

7    Q.  So what is the formal order of investigation?

8    A.  The formal order of investigation gives the staff subpoena

9    power and the ability to take testimony under oath.

10   Q.  As part of an investigation, correct?

11   A.  As part of an investigation.  But you can conduct an

12   investigation without a formal order.

13   Q.  Correct.

14         So is Carla Marin an officer of Traders Cafe?

15         MS. BERLIN:  Objection.  Relevance.

16         THE COURT:  Let me ask you a question.  How are the

17   records of Mint and Ms. Marin relevant to the Traders Cafe

18   investigation or the order directing the investigation of

19   Traders Cafe?  Why does it fall within this ambit?

20         THE WITNESS:  The formal order of authority that the

21   Commission gives the staff is not particularly tied to a formal

22   order.  A formal order can be entered at various times during

23   an investigation.  Therefore, it is not uncommon to have

24   individuals or entities eventually named in an enforcement

25   action that are not named in a formal order.

1      THE COURT:  I understand, but that wasn't my question.

2   My question is how was Swiss America or -- the reason why Mint

3   is relevant is because you say Swiss America and Mint Broker,

4   Ltd. and Mr. Gentile in connection with them did certain

5   things.  How is any of that related to Traders Cafe?

6      I understand that Traders Cafe is not the only person

7   you can investigate, but there has to be some nexus to Traders

8   Cafe to get to where you are today in order for the subpoena to

9   be legitimate.  What is the nexus?

10      THE WITNESS:  Yes, your Honor.  What I was struggling

11   with is answering your question without disclosing non-public

12   confidential information about an SEC investigation, how we

13   eventually started to investigate other entities or individuals

14   other than Traders Cafe and anyone associated with it.

15      THE COURT:  Well, I am going to require you to answer

16   that question because I think you need to show that it has a

17   legitimate relation to the original Traders Cafe, LLC.  I don't

18   need to know all of the details, but I need to know why there

19   is a relation there.

20      THE WITNESS:  Yes, your Honor.

21      THE COURT:  That is what you are traveling under

22   today, is this order directing the investigation.

23      THE WITNESS:  I was not involved in the initial

24   Traders Cafe investigation that resulted in an number of

25   enforcement actions and also criminal actions.  I took on or I

1   inherited the Traders Cafe investigation when my predecessor

2   left the SEC and I took his position.

3           In connection with the Traders Cafe investigation,

4   which I was not involved, it came to our attention that there

5   may be U.S.-based customers being solicited by a

6   Bahamian-registered broker-dealer but not registered with the

7   SEC in possible violation of Section 15, as noted in the final

8   order marked as Exhibit 1 today, specifically subsection (C).

9           MS. BERLIN:  Your Honor, may I attempt to assist the

10  court with inquiring because I think I understood what the

11  confusion is about why you're not getting a direct answer.

12          MR. BERKELEY:  Your Honor, I would just like to finish

13  my cross-examination and finish the point that your Honor

14  obviously correctly raised, which is this witness has no

15  personal knowledge about the Traders Cafe investigation, took

16  it over, can't testify about the relation and answer your

17  Honor's question about the relation and the nexus, which is one

18  of the arguments that we did put in our pleading that your

19  Honor now correctly highlights.

20          THE COURT:  She didn't finish -- finish answering the

21  question.

22          THE WITNESS:  I do have direct knowledge of the

23  Traders Cafe investigation.  It is my obligation to understand

24  ongoing litigation that --

25          THE COURT:  There is a lot of stuff that you're just

```
1   like throwing out here.

2            It is a simple question.  How is the subpoena

3   addressed to Ms. Marin and her company related to the order

4   allowing the investigation of Traders Cafe?

5            THE WITNESS:  Yes.  In connection with the Traders

6   Cafe investigation, as I just stated, we uncovered information

7   to lead us to believe that SureTrader was soliciting U.S.-based

8   customers in violation of Section 15a of the Exchange Act of

9   1934 as highlighted in number (C) of Exhibit B, the formal

10  order of investigation.

11           THE COURT:  OK.

12  BY MR. BERKELEY:

13  Q.  Why didn't you seek a new formal order of investigation?

14  Because clearly SureTrader has nothing to do with Traders Cafe.

15  That is a separate entity, correct?

16           MS. BERLIN:  Objection, your Honor.  Relevance.

17           MR. BERKELEY:  The relevance is creating the logical

18  nexus between Traders Cafe --

19           THE COURT:  The objection is overruled.

20           Go ahead.

21  BY MR. BERKELEY:

22  Q.  Is Guy Gentile a member of Traders Cafe?

23  A.  Not to my knowledge.

24  Q.  Is Swiss America an officer or a member of Traders Cafe?

25  A.  Not to my knowledge.
```

1    Q.   Is Carla Marin a member or officer of Traders Cafe?

2    A.   I don't know.

3    Q.   So the subject of the subpoena --

4    A.   I didn't get to answer your question.

5    Q.   -- Traders Cafe --

6    A.   There was a pending question that the judge overruled and

7    you asked another question without allowing me to answer the

8    question that was still pending.

9             THE COURT:  What question?

10            THE WITNESS:  Why didn't I seek a new formal order?

11            THE COURT:  OK.

12            THE WITNESS:  It is not a requirement to seek a new

13   formal order.

14   BY MR. BERKELEY:

15   Q.   The judge did sustain the objection.  But regardless, in

16   trying to figure out the answer to the judge's question, which

17   is the logical nexus, the relation as required under the

18   statute, you are seeking information from people that have

19   nothing -- that are not officers or representatives of Traders

20   Cafe.  Is that correct?

21   A.   That's not a requirement.

22            Can you point me to the requirement in law that

23   requires that we subpoena only people related to the title of

24   an investigation?

25   Q.   We can have that conversation afterwards, but right now

1   you're the one on the witness stand and I'm trying to extract

2   information from you as to how the Traders Cafe FOI is relevant

3   to Guy Gentile, Swiss America or Mint Custody, which is the

4   subject matter of the subpoena.

5   A.   The Traders Cafe investigation opened the door to the

6   conduct that we are currently investigating, as I previously

7   stated, that there was evidence that suggested that SureTrader,

8   known as Mint Broker International, was soliciting U.S.-based

9   customers in violation of Section 15a of the Exchange Act

10  without being registered with the Commission.

11  Q.   But U.S.-based customers, do you have any idea if it

12  relates to Traders Cafe?

13  A.   There is no requirement for that.

14  Q.   So then you can use this FOI, this formal order of

15  investigation, to investigate anything that the SEC deems fit

16  and necessary?

17  A.   I didn't say that.

18  Q.   So then there must be a legitimate purpose and there must

19  be a relation to it, correct?

20  A.   Yes, and I just told you that in connection with the

21  Traders Cafe investigation we uncovered evidence that, as we

22  are allowed because our investigations are fact-finding

23  missions and we seek to find any violations of the federal

24  securities laws, that opened the door to the conduct that we

25  are looking at now.  And again, 1(C) of the formal order.

```
1    Q.  One(C).  Can you show me -- you're talking about Exhibit
2    No. 1, subsection (C)?
3    A.  Yes, the formal order.
4    Q.  And that relates to Traders Cafe, its officers, directors,
5    employees, partners, subsidiaries and/or affiliates or other
6    persons or entities, correct?
7    A.  That's what the formal order states, yes.
8    Q.  So is Carla Marin an officer, director, employee, partner,
9    subsidiary and/or affiliate of Traders Cafe?
10            MS. BERLIN:  Objection.  Asked and answered.
11            THE COURT:  Overruled.
12   A.  Again, it's very uncommon to find an individual in a formal
13   order, and you will see if we look back through the history of
14   time of enforcement that entities and individuals not listed in
15   the formal order can be charged legally and properly by the
16   SEC.
17   Q.  Well, I understand that's your testimony.  I'm just looking
18   for evidence of that.
19            Is Guy Gentile an officer, director, employee,
20   partner, subsidiary or affiliate of Traders Cafe?
21   A.  Not to my knowledge.
22            MR. BERKELEY:  I have nothing further, your Honor.
23            THE COURT:  OK.
24            MS. BERLIN:  Brief redirect, please.
25            THE COURT:  Sure.
```

1    REDIRECT EXAMINATION

2    BY MS. BERLIN:

3    Q.  Ms. Weissman, assuming, just assuming that there needed to

4    be a connection between the title of an investigation and

5    someone you are going to subpoena, I will give you some

6    questions.

7          Did your investigation uncover that one of the

8    businesses that had a master account at SureTrader was Traders

9    Cafe?

10    A.  Yes.  That's what I was alluding to before.

11    Q.  So assume that we have to show a link between the names on

12    the order, am I correct in understanding Traders Cafe is one of

13    the customers that had a master account at SureTrader?

14    A.  Yes, it did.

15    Q.  OK.  And you saw that in the evidence in your

16    investigation?

17    A.  I did.

18    Q.  OK.  And SureTrader, the investigation presently concerns

19    their -- it is an unregistered broker-dealer -- their

20    involvement in having U.S.-based customers and not being

21    registered with the SEC, correct?

22    A.  Correct.

23          MR. BERKELEY:  Objection, your Honor.  That is facts

24    not in evidence.  Those are assumptions that the SEC is trying

25    to prove, but right now we have no evidence of that.

```
 1              THE COURT:  Overruled.
 2    BY MS. BERLIN:
 3    Q.  And one of the customers that SureTrader had was Traders
 4    Cafe, right?
 5    A.  Yes.
 6    Q.  And with respect to the SEC's purpose for the investigation
 7    being lawful, the formal order indicates which officers of the
 8    SEC can issue subpoenas?
 9    A.  That's right.
10    Q.  And that's Exhibit 1, correct?
11    A.  Correct.
12    Q.  And you and Mr. Sajjad Matin are the ones that issued it,
13    right?
14    A.  Yes.
15    Q.  The subpoenas.
16    A.  Yes.
17    Q.  You put in the formal order?
18    A.  Yes.
19    Q.  So you complied with the first requirement for issuing a
20    subpoena by having the people authorized by the SEC actually
21    signing the subpoenas, isn't that right?
22    A.  Yes.
23              THE COURT:  We are not going through all this again.
24              MS. BERLIN:  OK.
25    Q.  Next to talk briefly about the Mint Custody conduct with
```

1    respect to SureTrader.

2              MS. BERLIN:  May I please present Exhibit 6?

3              MR. BERKELEY:  Your Honor, I would actually object to

4    this.  This is outside the scope of my cross-examination.  She

5    is now looking to --

6              THE COURT:  I don't know.  Are you going to open up

7    into recross.

8              What is Exhibit 6?

9              MS. BERLIN:  Sure.  Exhibit 6 is a copy of the bank

10   statement, and the question was presented by counsel of

11   Ms. Weissman about Mint Custody and their connection to

12   SureTrader, which was known as Swiss America.  So we are simply

13   following up on that.

14             THE COURT:  And what are these records going to show?

15             MS. BERLIN:  These records are going to show that

16   Ms. Marin and her company received funds from SureTrader and

17   distributed them.

18             MR. BERKELEY:  They already dealt with that on direct.

19             THE COURT:  I am not going to allow that.

20             MS. BERLIN:  OK.

21             THE COURT:  Anything else for this witness?

22             MS. BERLIN:  There is nothing further for this

23   witness.

24             Thank you.

25             THE COURT:  We are going to take a -- well, ma'am, you

1    can step down.  Thank you.

2              THE WITNESS:  Thank you, your Honor.

3              (Witness excused)

4              THE COURT:  Anybody else want to make -- anything else

5    I need to discuss today?

6              MS. BERLIN:  On this matter, no.

7              THE COURT:  OK.

8              MS. BERLIN:  We have met our minimal burden under the

9    law and Ms. Marin should comply with it here where she has

10   personal jurisdiction.  This is where we subpoenaed her to show

11   up for her testimony, Miami.  This is where we subpoenaed her

12   to produce documents, Miami.  This is the relevant court.

13             THE COURT:  OK.  All right.  Good.

14             Anything from you?

15             MR. BERKELEY:  Your Honor, nothing further other than

16   similar conclusory statements and the fact that we believe that

17   personal jurisdiction must be established --

18             THE COURT:  I am going to allow both parties to brief

19   personal jurisdiction.  The SEC says that it is clear that

20   under the two cases, the Knowles case and I don't remember the

21   name of the other case, that it is U.S. minimum contacts which

22   is no contest that there is U.S. minimum contacts.  The

23   defendant or the respondent says, oh, no, you have to meet

24   minimum contacts.

25             So I am going to allow the respondent, how much time

1    do you want to file something on that?

2              What I want is cases regarding either the SEC or some

3    other United States agency that has authority to conduct -- in

4    other words, I would think the IRS would be very similar or

5    other investigative agencies that have their own subpoena

6    power.

7              MR. BERKELEY:  Yes, your Honor.

8              THE COURT:  That have a similar statute.  But I don't

9    want you citing me cases between two individual parties in the

10   State of Florida.

11             MR. BERKELEY:  I understand.

12             THE COURT:  That does me no good.

13             MR. BERKELEY:  I understand, your Honor.

14             Would 15 days be acceptable?

15             THE COURT:  No.  That is way too long.  You have a

16   week.

17             MR. BERKELEY:  Thank you, your Honor.

18             MS. BERLIN:  Your Honor, we would ask for less time

19   than that.

20             THE COURT:  I am giving them a week.  Do you want a

21   week to respond?

22             MS. BERLIN:  I just need three days.

23             THE COURT:  A week from today is -- today is what?

24             THE DEPUTY CLERK:  19th, Judge.

25             THE COURT:  March 26th.

1          Do you want to respond by the 29th?  I am willing to

2     give you up to a week.  If you don't want it, you can always

3     file it earlier.

4          MS. BERLIN:  Yes.  We would like to move as quickly as

5     possible.  They are already hindering our investigation.

6          THE COURT:  I don't think another week is going to

7     make a difference.

8          MS. BERLIN:  All right.  I will take a week.

9          THE COURT:  If you do it earlier, you do it earlier.

10          MS. BERLIN:  To be clear, the court is seeking case

11     law that states that the federal statute on jurisdiction is the

12     law of the land and there's not an exception to it.

13          THE COURT:  Yes.  You have to see what they file.  You

14     are limited to five pages.  So this isn't going to be a Supreme

15     Court brief.  Five pages on personal jurisdiction.

16          You know what I asked you here for today is, and I

17     understand why you didn't come here with it, is a case that

18     says that somebody versus the SEC or the SEC versus someone

19     where some district judge somewhere said that's ridiculous, you

20     don't have to meet my state's minimum contacts, you have to

21     meet United States minimum contacts.

22          The SEC says it's clear, but I haven't looked at the

23     cases because it wasn't -- other than the cases you cited which

24     were diversity cases or cases between private parties, I don't

25     think it was properly briefed.

1          All right.

2          MR. BERKELEY:  Yes, your Honor.

3          THE COURT:  I will tell you, I am going to have to do

4   a report and recommendation on this, but my inclination,

5   assuming there is personal jurisdiction, is to grant the SEC's

6   request to require your client to respond to the subpoenas.

7   But it is going to have to be in a report and recommendation.

8   I don't think I have the authority to order that.  It is going

9   to be subject, of course, to personal jurisdiction.

10          All right.  Anything else I can help you all with?

11          MS. BERLIN:  No.  Thank you, your Honor.

12          THE COURT:  Good seeing everybody.  Thanks.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

March 22, 2019            s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com